Lawrence William WRIGHT, Plaintiff-
Appellee,

v.

Daniel McMANN, Warden of Clinton Pris-
on, Defendant-Appellant.

UNITED STATES of America ex rel.
Robert MOSHER, Petitioner-
Appellee,

v.

J. Edwin LaVALLEE, Superintendent of
Clinton Correctional Facilitity,
Respondent-Appellant.

Nos. 95, 96, Dockets 35572, 35573.

United States Court of Appeals,
Second Circuit.

Argued Oct. 27, 1971.

Decided March 16, 1972.

Betty D. Friedlander, Waverly, N. Y. (Herman Schwartz, Buffalo, N. Y., and William C. Scott, Jr., Portland, Or., on the brief), for appellee Lawrence William Wright.

William Bennett Turner, San Francisco, Cal. (Jack Greenberg, Stanley A. Bass, New York City, and Alice Daniel, San Francisco, Cal., on the brief), for appellee Robert Mosher.

Hillel Hoffman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for defendants-appellants.

Before LUMBARD, HAYS and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Lawrence William Wright in March 1966 brought suit under the Civil Rights Act, 42 U.S.C. § 1983, against appellant

McMann in the Northern District of New York. Wright's *pro se* complaint alleged that Warden McMann and other prison officials at the Clinton Correctional Facility had deprived him of his constitutional rights during two periods of solitary confinement. The district court dismissed the complaint on the alternate grounds that it was insufficient to show any constitutional violation and that it should have been brought first in the state courts. This court reversed, Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), finding that neither the doctrine of exhaustion of state remedies nor the doctrine of federal abstention was properly invoked.[1] This court also noted that Wright's claims, if true, were sufficient to make out a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Remanded to the district court, Wright's cause came on for trial in October 1968.

Consolidated with Wright's action was the Civil Rights suit of appellee Robert Mosher, commenced in May 1967 against Warden McMann, for whom appellant LaVallee was substituted when the latter became Superintendent of Clinton in January 1968. Mosher's complaint tracked Wright's insofar as constitutional violations stemming from segregated confinement were alleged: unlike Wright, Mosher pursued only injunctive relief and did not claim damages.

Judge Foley, sitting without a jury, heard testimony of appellees, appellants, and their respective witnesses [2] for seven days. He rendered decision on July 31, 1970, reported at 321 F.Supp. 127, and entered two orders, on August 19, 1970 (unreported), granting relief along the following lines:

(a) Appellants were enjoined from all use of segregation until they promulgated rules and regulations ensuring, among other things, that segregation cell facilities were adequate to safeguard the health of occupants, that heat and ventilation were sufficient, that nudity could not be enforced solely as a disciplinary measure, and that provisions be made for "surprise" inspection visits by trained supervisory personnel.

(b) Appellants were further required to promulgate, and submit for the district court's approval, rules and regulations governing procedures of prison disciplinary hearings, and rules and regulations governing the condition of psychiatric observation cells as well as the procedures used to determine whether an inmate should be confined to such a cell.

(c) As to Wright and Mosher specifically, appellants were enjoined from placing either in segregated confinement or otherwise punishing them so as to deprive them of "good time" or their ability to earn "good time" without affording them, *inter alia*, the following: prior notice of the charge for which segregation might be suitable punishment, the right to "appropriate" representation at a hearing where Wright or Mosher could present his version of the facts giving rise to the charge, and the right to call witnesses and to have made a record of the proceedings.[3]

(d) As to Mosher alone, appellants were ordered not to "censor or interfere

---

1. The propriety of invoking these doctrines in state prisoner § 1983 cases was recently considered and rejected by a majority of the judges of this Circuit sitting *in banc*. Rodriguez v. McGinnis, United States ex rel. Katzoff v. McGinnis, Kritsky v. McGinnis, 456 F.2d 79, Second Circuit, decided Jan. 25, 1972. Disposition of the instant case was accordingly postponed while that issue was under consideration.

2. In addition to Wright, Mosher, McMann, and LaVallee, nine other inmates and eleven other correctional offices presently or previously at Clinton Correctional Facility, Dannemora, New York, testified. In all, twenty-six witnesses testified, filling nearly 1600 pages of transcript.

3. If at such a hearing the decision was adverse to Wright or Mosher, and segregation was deemed suitable, it could not be imposed "UFO" (until further orders) but instead must provide for a determinate length of confinement. The reasons for such a decision were required to be reported, and the decision to be reviewed by the warden. A further, formal means of administrative appeal was also required.

in any way with any correspondence" between him and his attorney. Judge Foley also ordered restoration of 616 days of Mosher's "good time," 440 of which had been revoked in prison disciplinary proceedings during his confinement to segregation and 176 of which he was prevented from earning because of such confinement.

(e) Wright was awarded $1500.00 compensatory damages for his illegal confinement to segregation as against appellant McMann.

(f) Appellants were also enjoined from confining Wright or Mosher in psychiatric observation cells for disciplinary purposes or without psychiatric justification, and from prohibiting inmates to give legal advice or assistance to each other subject to reasonable regulation.

█ For the reasons set out below, we reverse those portions of the district court's orders requiring trial-type procedures (para. c) or the promulgation of rules and regulations either regarding trial-type procedures in prison disciplinary hearings (para. b) or governing the use and facilities of segregation or psychiatric observation cells (para. a); we modify that portion of the order enjoining appellants from censoring or interfering in any way with any correspondence between Mosher and his attorney (para. d); and we affirm those portions of the orders restoring Mosher's "good time" and awarding damages to Wright (para. d. and e). It should go without saying that, where we have reversed the requirements that appellants promulgate rules and regulations, appellants are under no obligation to make submissions of any kind for the district court's approval. Appellants do not contest, and we find warranted, and affirm, those portions of the orders below prohibiting appellants from confining Wright or Mosher to psychiatric observation cells for disciplinary purposes or without psychiatric justification, and prohibiting appellants

from denying inmates the opportunity to render legal advice or assistance to each other subject to reasonable regulation (para. f).

█ In reversing the original dismissal of Wright's cause of action this court noted that there would be "no hesitation in holding that the debasing conditions to which Wright claims to have been subjected . . . would, if established, constitute cruel and unusual punishment in violation of the Eighth Amendment." Wright v. McMann, 387 F.2d at 525. Indeed, most of Wright's allegations were subsequently established. Judge Foley found, and appellants do not here contest, that for eleven days in 1965 and 21 days in 1966 Wright was kept, sometimes or always completely naked,[4] in a "strip cell"—that is, a cell barren of all furnishing save a toilet and washbowl. Nudity was enforced to demean and punish the inmate. No bedding of any kind was provided, forcing Wright to sleep on the concrete floor. His eyeglasses were taken from him, and he was provided neither soap, towels, nor toilet paper. Privileges were at a minimum during confinement to the strip cells, inmates so confined were required to jump to attention at the cell door whenever a guard passed, and the temperature during the night was sufficiently cold to cause extreme discomfort to the inmate sleeping naked on the concrete floor without even a blanket. No program existed for cleansing the cell from the time one inmate left until another arrived, and provisions for occupant-inmates to scour the cell were inadequate. The psychiatric observation cell had neither toilet nor washbowl: occupants were required to coordinate trips to the bathroom with the convenience of the guards. The practice at that time was "to put the rebellious prisoner in the hands of the guards under unsanitary conditions that would make him subservient and break him down," 321 F. Supp. at 143.

---

4. Both the transcript and the lower court opinion indicate alernately that Wright was nude either for the duration or for substantial periods but not always, e. g., 321 F.Supp. at 140, 141.

As to Mosher, Judge Foley found that he was confined to segregation for five months in 1967, that two months after his return to general population he was again placed in segregation, where he spent a year,[5] for the same violation which caused him to be sent to segregation the first time, *viz.*, refusal to sign a "safety sheet" detailing safety rules to be observed in prison workshops. Judge Foley found Mosher sincere in his belief that his signature on the sheet would constitute a waiver of prison liability were he to be injured in the shop. Segregation cell conditions were considerably less abhorrent than when Wright was in occupancy.

These findings of the district court are amply supported by the record and are not disputed on appeal. The parties have joined issue primarily with respect to the various forms of relief granted by the district court.

■ Our disposition is largely controlled by Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972) decided subsequent to the lower court ruling herein. In *Sostre* this court sitting *in banc* considered, *inter alia,* the delicate balance between the due process rights of state prisoners charged with infractions of prison rules and the necessity for the maintenance of prison order and security. The district court's order that trial-type procedures accompany prison disciplinary hearings was reversed, in the main because the federal courts are inappropriate to the task of weighing the effect of elaborate procedural safeguards on either the outcome of a particular hearing or prison morale in general, *id.* at 194–199. *Sostre* thus mandates reversal of Judge Foley's requirement that appel-

lants promulgate and adhere to rules and regulations regarding either trial-type procedures in prison disciplinary hearings or procedures to be used in determining whether an inmate should be confined to a psychiatric observation cell. *Sostre* also indicated, however, that a "minimally fair and rational" inquiry would require observation of "such basic safeguards against arbitrariness as adequate notice, an opportunity for the prisoner to reply to charges lodged against him, and a reasonable investigation into the relevant facts—at least in cases of substantial discipline." *Id.* at 198, 203. In short, because we are loathe to graft onto state prison disciplinary hearings a broad panoply of procedural requirements does not mean that rudimentary due process can be ignored at the caprice of prison officials.[6]

■ We think that *Sostre* also requires us to reverse the lower court's order prohibiting appellants from confining any inmate to segregation or psychiatric observation cells until rules and regulations regarding conditions of such cells have been promulgated. Little purpose would be served by yet another reiteration of the deplorable segregation cell conditions extant at late as 1965 and 1966. Suffice it to repeat what we said in the first *Wright* opinion:

We are of the view that civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded and exposed to the bitter cold of winter in northern New York State and to be deprived of the basic elements of hygiene such as soap and toilet paper. The subhuman conditions alleged [and substantially proved] by Wright to exist in the "strip cell" at Dannemora could only serve to destroy completely the

5. His lengthy confinement resulted in part from infractions committed while he was in segregation. *See* note 7 *infra.*

6. The rules and regulations of the New York State Department of Correctional Services have been changed since the decision below, in an attempt, according to appellants, to bring prison disciplinary

hearing procedures at least to the minimum recognized in *Sostre. See* 7 N.Y.C. R.R. §§ 250–270. As with recent State efforts regarding cell conditions and treatment of inmates, *infra,* we commend the state for its responsiveness but say nothing, of course, as to the constitutionality of the new rules.

spirit and undermine the sanity of the prisoner. The Eighth Amendment forbids treatment so foul, so inhuman and so violative of basic concepts of decency. Trop v. Dulles [356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630] . . .

387 F.2d at 526 (footnotes omitted). Similarly, we noted in *Sostre* that the conditions endured by Wright were "truly barbarous and inhumane," 442 F.2d at 194 & n. 27. Other courts have likewise found such conditions in violation of the Eighth Amendment, *e. g.*, Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971); Jones v. Wittenberg, 330 F. Supp. 707 (N.D.Ohio 1971); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd 435 F.2d 1255 (3rd Cir. 1970), cert. denied 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); Hancock v. Avery, 301 F.Supp. 786 (M.D. Tenn.1969); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Calif.1966).

Our decision to reverse is a reflection of concern for the respective roles and responsibilities of federal courts and state officials, and not in any way an approval of the inhumane, degrading treatment occupants of segregation were forced to endure. Reversal is the more appropriate because New York has on its own motion acted to remedy perceived deficiencies in treatment of inmates in general as well as those confined to segregation or psychiatric observation cells. At oral argument, counsel for appellees, upon assurance by the state that the new rules of the Department of Correctional Services apply to psychiatric observation cells as well as to segregation cells, as much as conceded that the part of the district court's order dealing with this matter was no longer needed.

We say nothing as to the constitutionality of the new rules, but we note that the New York Correction Law was amended in 1970 to provide that each inmate is "entitled to clothing suited to the season and weather conditions and to a sufficient quantity of wholesome and nutritious food," that no inmate shall be subjected to degrading treatment, that inmates confined to segregation cells "shall be supplied with a sufficient quantity of wholesome and nutritious food," and that "adequate sanitary and other conditions required for the health" of inmates in segregation shall be maintained. The facility superintendent is also required to make full reports regarding segregation inmates every five days to the commissioner. N.Y.Correction Law § 137, McKinney's Consol.Laws c. 43 (1971 Supp.)

The new rules of the Department of Correctional Services provide that no cell is ever to be maintained "as a place to subject an inmate to punitive confinement or confinement under degrading conditions," that no inmate "is ever to be confined in a place that is poorly lighted, poorly ventilated, inadequately heated, or likely to be injurious to his health," that every cell is to be equipped with lighting sufficient to read by, and with washstand, toilet, bed, and mattress (although they may be removed if there is imminent danger that such furnishings will be destroyed by the occupant or utilized to harm himself), that all inmates are entitled to personal hygiene supplies, cleansing equipment for the cell, writing materials, eyeglasses, and at least five books over and above legal materials. Provisions are also made for showers and exercise of segregation cell inmates, and regularized procedures established in the event an inmate is deprived of an otherwise required item or activity. The rules also provide that under no circumstance is an inmate to be deprived of an item or activity for the purpose of punishment or discipline. 7 N.Y.C.R.R. §§ 300.1–301.9.

This court in *Sostre* also weighed carefully the competing claims regarding censorship of communication, 442 F.2d at 199–201. The conclusion was that prison officials may not delete material from, withhold, or refuse to mail a communication between an inmate and his attorney, or a court, or public official, unless the inmate or his correspondent abuses the access. Inmate allegations

considered false, repetitious or malicious by the prison authorities do not amount to an abuse of access, which was defined in *Sostre* in terms of transmittal of contraband or the laying of plans for some unlawful scheme. Inasmuch as interference with inmate correspondence might be justifiable under such circumstances, we "necessarily rule[d] that prison officials may open and read all outgoing and incoming correspondence to and from" inmates, *id.* at 201. We therefore modify, to conform with *Sostre*, Judge Foley's order prohibiting censorship or interference "in any way with any correspondence" between Mosher and his attorney. Appellants may open and read correspondence between Mosher and his attorney, but they may not otherwise impede or interfere with it absent a clear abuse of access such as *Sostre* discusses.

We are advised by appellants that the recent policy of the Department of Correctional Services is to refrain even from opening and reading inmate-attorney mail. While this experimentation by the state indicates a willingness to go beyond what *Sostre* required, we are not persuaded that there is any need for the district court order to do likewise. What the federal courts must or should order and what the states are at liberty to essay are frequently poles apart. It is best that the state be left free to abandon its experiment and substitute other proper methods if it should conclude that it is advisable to do so.

■ Mosher's 616 days of "good time" were appropriately restored to him by the district court. He was first confined to segregation in 1967. After five months he was released to the general population, but two month later he was returned upon repeat of the very viola-

tion for which he was punished with segregation in the first place. His second stay consumed a year, as he was confined "until further orders" and prolonged matters with various rule infractions while in segregation.[7]

Segregation conditions during Mosher's tenancy, while not ideal according to his testimony, especially in the cells comprising Section 4 (the "strip cells"), were nonetheless considerably improved since Wright's occupancy, and the district court's decision to restore lost "good time" rested on the finding that segregation was "grossly disproportionate for the offense committed" by Mosher. Judge Foley also found "that procedural safeguards * * * in this instance might have averted or corrected this improper punishment," and that the disproportionate initial punishments were "linked clearly to the later violations in segregation." 321 F.Supp. at 145.

Ordinarily we would be most reluctant to find unconstitutionally disproportionate the use of segregated confinement as punishment. Prison officials, not federal judges, are in day to day proximity or contact with the inmates and are consequently better able to determine what punishment might or might not be appropriate to a particular offense committed by a particular inmate. An offense representing another in a series by one inmate might meet a harsher response than the same offense committed by an inmate with a "clean" prison record. Or a prison official might decide that a harsh punishment for a repeatedly disruptive inmate might, under the circumstances, simply reinforce a cycle of offense and punishment which the sagacious employment of leniency might avoid. In short, the inmate alleging disproportionate punishment will ordinarily have a heavy burden.[8]

7. While in segregation Mosher apparently yelled to other inmates (4 charges), was insolent or loud (5 charges), possessed contraband tobacco, gum, and fruit (a banana), threw four slices of bread out his window, and refused to stand at attention whenever a prison employee passed (8 charges). Exhibit E.

8. *See also* Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd 435 F.2d 1255 (3d Cir. 1970), cert. denied 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); Graham v. Willingham, 384 F. 2d 367 (1967).

Here, however, we think that Mosher has successfully met this burden. His offense was his refusal to sign a prison "safety sheet," a single piece of paper with a list of precautions and instructions to be followed by inmates assigned to certain shops in the prison. The following circumstances in combination persuade us that Judge Foley was correct in finding segregation a disproportionate response to Mosher's refusal to sign the sheet:

First, Judge Foley found as a fact, and it is not suggested that this finding be disturbed on appeal, that Mosher believed in good faith that his signature would be the equivalent of a waiver by him of his right to sue the prison in the event he was injured while working in a prison shop due to the negligence of prison officials. This is important inasmuch as it bears on Mosher's attitude and the character of his defiance; that is, Mosher was apparently not making trouble for the sake of being a troublemaker.

Second, testimony by deposition of both Deputy Warden DeLong and Warden McMann indicates that the sole purpose of the safety sheet was simply to assure that inmates were familiar with shop safety regulations. Deputy Warden DeLong, upon whose immediate direction Mosher was sent to segregation, testified that even if an inmate had read and understood the safety sheet he could not work until he signed, and a refusal to sign was tantamount to a refusal to work in his eyes. We have been pointed to no prison manual or rulebook authorizing such an interpretation of a refusal to sign or giving notice to an inmate that such a refusal was a violation or might result in segregation.

Third, and perhaps most important, is Warden McMann's testimony that segregation as punishment for refusal to sign the sheet was inappropriate. Indeed, he testified that no punishment whatsoever was warranted: assignment to "idle" population, where the inmate could not work and earn extra money, was the ordinary consequence of an "offense" such as Mosher's.

In short, for an act which even the warden found deserving of no punishment Mosher was disciplined with the worst punishment the prison had to offer, and it has nowhere been suggested that such a result came about through anything other than the unfettered discretion of the deputy warden. While the area of discretion of prison officials is exceedingly broad, it is not limitless. Appellants urge nothing more specific than that Deputy Warden DeLong's "personal experience" with Mosher somehow justified the use of "his discretion as a disciplinary officer in sending Mosher to segregation." Testimony from the record is no more illuminating: on the day Mosher was punished with segregation he had four previous offenses in prison;[9] that same day another inmate with six offenses refused to work[10] and was punished by DeLong with deprivation of yard privileges for 15 days. When DeLong was asked whether there was any reason for the difference in the punishment, he replied, "I do not recall anything about [the other inmate] nor do I recall anything in particular about Mosher at that particular time. The only thing I can say is that due to the particular circumstances surrounding the case at that time, this was my decision."[11]

The word "discretion" is not talismanic. We think that when an inmate is punished as severely as possible for an act which the warden testifies deserves no sanctions whatsoever it behooves the punishing official to come forth with some justification other than that "the particular circumstances" warranted such discipline.[12]

9. These offenses, none of them involving physical violence or threat thereof, occurred over a period of three years, dating from Mosher's entry into the prison.

10. Mosher did not refuse to work. He merely refused to sign the safety sheet.

11. Deposition of Perry J. DeLong, p. 117, Exhibit #2.

12. *See also* Fulwood v. Clemmer, 206 F. Supp. 370 (D.D.C.1962).

*Sostre* is by no means to the contrary. This court there refused to find disproportionate punishment noting its reluctance to "deny to prison authorities the power to use an entirely constitutional means of discipline in response . . . to a prisoner's refusal . . . to obey valid prison regulations." 442 F.2d at 194. In a footnote to that passage, however, we said:

> We stress the seriousness of the multiple offenses charged against Sostre by Warden Follette . . . and express no view as to the constitutionality of such segregated confinement as Sostre experienced if it were imposed for lesser offenses. Specifically, we express no view as to the constitutionality of such segregated confinement if it had been imposed on account of any one or any combination of the offenses charged against Sostre other than all of them.

*Id.* n. 28.

Thus, although *Sostre* clearly holds that the federal courts should be chary in entertaining inmate petitions claiming unconstitutionally disproportionate punishment, it is equally clear that *Sostre* recognizes that such a constitutional violation might be made out under circumstances more compelling than those present therein.

■■ We turn finally to the award by the District Court of $1500.00 damages in Wright's favor against appellant McMann. Reversal is urged on the ground that, although Judge Foley specifically rejected a defense of good faith or probable cause on the part of McMann, he made no finding that McMann personally imposed the deprivations that resulted in the unconstitutional treatment. To find McMann liable when lower prison officials were directly responsible for Wright's treatment, it is argued, is to assess him under a theory of vicarious liability. We disagree.

In the first place, although Judge Foley made no specific findings to this effect, there is indeed evidence in the record from which it could readily be inferred that McMann had definite knowledge of the condition of the "strip cells." As both Judge Foley and this court in the first *Wright* opinion pointed out, McMann's Answer to Wright's complaint acknowledged pointblank that Wright's treatment was commonplace. The Answer states:

> It is the practice at Clinton Prison to place certain inmates in what is known as a strip cell at the time of their reception in segregation. . . . A strip cell has only the bare necessities and at times the clothing is taken from the prisoner and at night he is given a blanket to sleep upon the floor.

Also indicative of McMann's actual knowledge is the uncontradicted testimony of Wright that, upon his written complaint, F.B.I. officers interviewed him for several hours in a library behind McMann's office in 1965, and again upon a subsequent complaint from Wright in 1966. During the first interview, according to Wright, the federal officers informed him that they had spoken with McMann as part of their investigation of his complaint.

Wright also testified without contradiction that while he was in segregation his complaints addressed to McMann resulted in his glasses and certain legal materials being restored to him. Furthermore, a letter sent to the commissioner of correction by Wright, in which he thoroughly detailed the conditions he was forced to endure in the "strip cell," passed through McMann's office en route and was read and initialed by him.[13]

Thus there is abundant evidence from which to conclude that McMann must have actually known of the strip cell conditions at the time in question.[14] Furthermore, he was charged with having

---

13. Exhibit 43 and Tr. 1463.

14. While we might remand to the district court for more specific findings in this matter, there is so much undisputed evidence in the record that this course is unnecessary.

such knowledge. Ultimate responsibility for the operation of the segregation cells was his, as is made clear from trial testimony, the Employees Rule Book of the New York State Department of Correction then in effect, and section 18, N.Y. Correction Law, McKinney's Consol. Laws c. 43 (1968), as amended L.1970, c. 476, § 4 (1971 Supp.). Furthermore, section 114–a [15] of the New York Correction Law required that the warden

> shall cause to be kept a daily record of the proceedings of the prison, in which shall be entered a note . . . of every punishment inflicted on a prisoner, the nature and amount thereof and by whom it was inflicted, and also a memorandum of every well-founded complaint made by any prisoner of bad or insufficient food, want of clothing, or cruel or unjust treatment by a guard; . . .

As against these directives that the warden exercise responsibility for and be familiar with the treatment of inmates, however, Judge Foley found that "there was a design . . . to avoid written rule-making in the Clinton segregation unit" and that McMann made only "rare" visits to the segregation cells, 321 F. Supp. at 143.[16] In short, applying the common law tort standard appropriate in § 1983 cases, that one is liable for the "natural consequences of his actions," Monroe v. Pape, 365 U.S. 167, 187, 81 S. Ct. 473, 5 L.Ed.2d 492 (1967), we think appellant McMann knew or should have known that Wright was being forced to live under conditions described previously by this court as "foul" and "inhu-

mane," 387 F.2d at 526, and today held unconstitutional.

We think Wright should be properly compensated for the suffering he had to endure, and recovery should not be defeated by an attempt by the warden to shift responsibility to inferiors when there is every reason to believe that he was aware of segregation cell conditions and when responsibility for permitting such conditions to exist was ultimately, in any event, squarely his. We are not moved by the suggestion that if we uphold liability today competent persons tomorrow will refuse to become superintendents, as the title is presently designated. In the unlikely event that a prospective superintendent in fact turns down an offer for fear of personal liability, we think that the position is probably better filled by someone determined to supervise the facility so as to prevent the type of inmate treatment giving rise to this lawsuit.

OAKES, Circuit Judge (concurring):

I concur both in the result and in so much of Judge Lumbard's opinion that this opinion would be superfluous if I did not rather fundamentally disagree with the language of two parts of that opinion.

First, I believe it would be entirely appropriate—indeed mandated by the due process clause—for a federal court, absent state action, to require basic procedural safeguards in connection with prison disciplinary proceedings or to regulate conditions under which inmates are held in segregation or observation cells. Sostre v. McGinnis, 442 F.2d 178 (2d Cir.

---

15. This section has been amended in light of nomenclature changes, e. g., correctional facilities for prisons, inmate for prisoner, employee for guard. The substance remains the same. N.Y. Correction Law § 1114–a, McKinney's Consol.Laws c. 43 (1971 Supp.).

16. Judge Foley relied for this finding in part upon the following testimony of appellant McMann:

> Q. Now during your tenure as warden, during these four years, did you have occasion to visit the segregation units?

> A. I went there occasionally.

> Q. Well, how often would you say that is? A. Well, very seldom, I don't pretend I went there very often, I couldn't tell you how often.

> Q. Did you go there—don't you recall, can you make any estimate as to how often you went there? A. It wouldn't be any more often than six months, sometimes longer.

Tr. 1447.

1971), cert. denied, 405 U.S. 978 (1972), does not go so far as to hold otherwise although it rejected the orders made in that case. 442 F.2d at 194, 198. Since *Sostre* was decided, other courts have exercised under varying circumstances rather broad supervision of particular prison systems to assure—with rules by court order—that prisoners not be subjected to the "capricious and arbitrary actions of prison officials," as decried by *Sostre, supra* at 198. Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971). The case is so old, however, and so much has transpired since it was initiated—including but not limited to the adoption of new rules by the New York Department of Correctional Services and amendment of the New York Correction Law, as set forth in Judge Lumbard's opinion—that it does not seem to me to be an appropriate vehicle for federal court promulgation of minimal correctional standards. Under appropriate circumstances, however, judicial intervention may be clearly warranted—nay, required—and this it seems to me Judge Lumbard's opinion does not make sufficiently clear. Thus, my own views as to federal judicial power accord closely with those of Judges Waterman, Smith and Feinberg, respectively concurring or concurring and dissenting in *Sostre, supra,* 442 F.2d at 206 and 207, although I do not believe this to be the appropriate case for its exercise.

I believe that Judge Lumbard's opinion correctly interprets *Sostre* in reference to censorship and communication by an inmate with his counsel, even though cases since *Sostre* have tended to take a view somewhat more protective of inmate rights. *E. g.,* Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971). In view of the new policy of the Department of Correctional Services to refrain from opening and reading inmate-attorney mail, however, this is plainly not the case in which this aspect of *Sostre,* 442 F.2d at 199–201, might bear re-examination.

Given appropriate circumstances, however, I believe this court should not hesitate to accept the invitation of *Sostre* to expound "a more precise delineation of the boundaries of this protection . . .," 442 F.2d at 201, and if in doing so we necessarily draw them somewhat differently from *Sostre* itself, that is not impermissible. See Note, Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1972).

HAYS, Circuit Judge, dissenting in part:

I dissent from the affirmance of the district court's restoration of good time to Mosher, and the award of damages to Wright against Warden McMann. In all other respects I concur with Judge Lumbard's opinion.

The restoration of good time to Mosher solely on the grounds of the disproportionate length of his term in segregation is an unwarranted extension of Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 30 L.Ed.2d 254, and it violates good sense as well. Unlike Sostre, Mosher was not punished for engaging in constitutionally protected activity, nor did his punishment constitute such extreme physical abuse that the federal court was justified in intervening. *E. g.,* Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Inmates of the Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971); Sostre v. McGinnis, *supra.* When one considers that we are powerless to reduce a prison sentence no matter how "disproportionate" the sentence may be to the offense, see, *e, g.,* X. v. United States, 454 F.2d 255 (2d Cir. 1971) (Hays, Circuit Judge, concurring), there seems to be no adequate ground for our reviewing the loss of good time solely because the punishment appears excessive.

I also disagree with the majority's affirmance of the award of damages against McMann. The argument that

McMann is "charged with" knowledge because of his statutory duties advances a theory of vicarious liability which is inappropriate in civil rights cases. See Avins v. Mangum, 450 F.2d 932 (2d Cir. 1971).