**Masia A. MUKMUK, also known as Sylvester Cholmondeley, Appellant,**

v.

**COMMISSIONER OF the DEPARTMENT OF CORRECTIONAL SERVICES et al., Appellees.**

No. 210, Docket 74–1504.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1975.

Decided Jan. 13, 1976.

Certiorari Denied June 1, 1976.
See 96 S.Ct. 2238.

David J. Fine, New York City (Elizabeth M. Fisher, David Rosenberg, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for appellant.

David L. Birch, Deputy Asst. Atty. Gen. of the State of New York (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for appellees.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

GURFEIN, Circuit Judge:

The plaintiff, Masia Mukmuk, is a Black Muslim leader who spent 15 years in New York state prisons.[1] From his own allegations in his civil rights complaint, he was an activist in prison. One cannot help but read between the lines

1. He was released on parole in January, 1975.

that he has been a thorn in the side of prison officials during most of his prison life. Such activism tends to elicit a reactive use of power. To persons in authority in the prison scene that power is readily available. The serious question raised is whether the boundaries of permissible sanctions by the corrections officers were crossed and the constitutional rights of Mukmuk under the Eighth, Fourteenth and First Amendments violated.

This is a § 1983 action which has long endured upon the docket of the District Court for the Southern District of New York with but little movement. The action was begun in August 1970. The complaint was twice amended. In October 1973, a motion for summary judgment was made by the defendants, who are the Commissioner of the Department of Correctional Services; J. Edwin LaVallee, Superintendent of the Clinton Correctional Facility; Vincent R. Mancusi, Superintendent of the Attica Correctional Facility; and John L. Zelker, Superintendent of the Green Haven Correctional Facility.[2]

The plaintiff countered with his own motion for summary judgment and with a motion for leave to file yet another amended complaint, which was denied as coming too late. Judge Bonsal granted the defendants' motion for summary judgment, generally upon the ground that what Mukmuk alleged did not sink to the indignity of constitutional violation. 369 F.Supp. 245 (S.D.N.Y.1974). Much as we sense provocation by the plaintiff, we must, nonetheless, hold that

he has alleged triable issues of fact under existing precedents which defeat a summary judgment. We affirm, however, the denial of the right to file another amended complaint as being in the court's discretion (except with respect to the naming of additional defendants, see note 5 infra). The factor of time is not insignificant in these matters. For the very reasons that lead legislatures to enact statutes of repose, courts must acknowledge the special difficulties involved in trying to find truth when old cases come to untimely trial. In the prison setting, with a multitude of persons under custody and a continuing series of disciplinary problems recurring in various forms, it is not easy to recall the dramatis personae who enacted each incident. Memory tends to become kaleidoscopic instead of focusing upon the single scene or even the particular inmate.

Since we must reverse the summary judgment, we shall sketch the allegations that lead us to this course.

Appellant was sentenced, on a plea of guilty, on June 29, 1960 to concurrent terms of five to ten years on two burglary and larceny convictions, to be served consecutively to a term of ten to twenty years on a rape conviction. Upon sentencing he was sent to the Elmira Reception Center, and thence to various New York state prisons.[3] On June 12, 1972, the Appellate Division, Second Department, directed that his three sentences run concurrently.

Mukmuk was held in solitary confinement or keeplock for over seven years

---

**2.** Earlier defense motions to dismiss for lack of prosecution were denied. Various other procedural moves are described in the opinion below. Mukmuk v. Commissioner of Dep't of Correctional Services, 369 F.Supp. 245 (S.D.N.Y.1974). A prayer for restoration of good time credits was dismissed as in the nature of a petition for habeas corpus without exhaustion of state remedies. See Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). We agree.

**3.** In September 1960, he was sent from the Elmira Reception Center to Auburn Prison. On September 13, 1962, he was transferred to

Clinton Prison where he remained until he was transferred to Attica Prison in February 1965. In March 1966, he was transferred to Green Haven. In February 1967, he was transferred back to Clinton Prison. In February 1968, he was returned to Auburn. In May 1969, he went back to Attica. In February 1970, he was transferred to Green Haven Prison. Later that year he was transferred back to Clinton where he was incarcerated when he filed his second amended complaint in May 1971. We have given this history to put the violations complained of in their proper setting of time and locale.

out of a total prison life of fifteen years. Much of the confinement was avowedly punitive, for Mukmuk was a troublemaker by his own averment. He alleges most directly four or five incidents for which he seeks redress.[4]

I

Appellant claims damages for a punishment of twelve days of solitary confinement imposed on him while at Green Haven in January 1967 for the possession of "inflammatory writings" and for setting up a school for Muslims. As the Supreme Court indicated in *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and as this circuit held in *Pierce v. LaVallee,* 293 F.2d 233 (2 Cir. 1961), prisoners retain their First Amendment rights relating to religious freedom. See also *Kahane v. Carlson,* 527 F.2d 492, 495–96 (2 Cir. 1975). In 1964 we gave the New York Corrections authorities more time to propose rules for the regulation of Black Muslim prisoners, while indicating that as a religious group they possessed First Amendment rights even in prison. *Sostre v. McGinnis,* 334 F.2d 906 (2 Cir.), *cert. denied,* 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964). To the extent that the literature here involved may have been religious in character, the Warden had received sufficient warning from the courts by 1967 that it was unconstitutional to impose punishment for its possession. If it was, indeed, religious literature, the warden may be liable in damages, assuming that a sufficient personal responsibility is shown.[5] *Johnson v. Glick,* 481 F.2d 1028, 1033–34 (2 Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973). If the literature was exclusively nonreligious, punishment for its mere possession may be unconstitutional under present standards. See *Sostre v. McGinnis,* 442 F.2d 178, 202–03 (2 Cir. 1971) *(en banc), cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); *United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 588 (2 Cir. 1975). But it does not necessarily follow that the warden is liable in damages; it might be possible for him to establish that, under the law as it existed in 1967, his actions were in "good-faith reliance on a pre-existing procedure." See *Cox v. Cook,* 420 U.S. 734, 736, 95 S.Ct. 1237, 1238, 43 L.Ed.2d 581 (1975), discussed *infra; Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). These

---

4. There is also a generalized claim of alleged religious discrimination against appellant because he has been a Black Muslim since the fall of 1961. In addition to an allegation that he was put in segregation in January 1967 because he was setting up a school for Muslims, which is discussed in Part I, *infra,* the only incidents cited in support of the theme occurred in 1961 at Auburn Prison and 1962 and early 1963 at Clinton Prison. His 1962 segregation at Clinton Prison lasted until February 20, 1965.

His claims of alleged discrimination thereafter were apparently based not on his religious beliefs but on his political beliefs and on his being a "Black Man." While a bare allegation of religious discrimination might not be enough to require a trial, appellant may present evidence on the subject since we are remanding for trial on other issues.

5. The District Court made an alternative holding in its grant of summary judgment that the plaintiff had failed to allege or show the requisite degree of personal responsibility on the part of the named wardens, in that the allegations were not specific enough. It is undisputed that certain incidents occurred at times when none of the named defendants was at the relevant institution, and on these incidents the summary judgment grant was entirely appropriate. However, the names of the persons who were in charge of the relevant prisons during the time petitioner was confined therein are of public record, and the plaintiff should be permitted to amend his complaint to name them as defendants. Furthermore, both sides seem to assume that the Commissioner named in the complaint is Commissioner McGinnis. Since there are no problems of notice or fairness involved in this designation, we assume that the Commissioner designated was Mr. McGinnis, for a § 1983 action is a personal one and does not run with the office. Plaintiff should be permitted to amend his complaint to specifically designate Mr. McGinnis as a named defendant.

Moreover, as we noted in *Wright v. McMann,* 460 F.2d 126, 135 (2 Cir. 1972), under New York State law the warden of an institution is (and was) specifically responsible

issues preclude the grant of summary judgment.[6]

## II

■ Appellant seeks damages for a "keeplock" (in which an inmate is locked in his cell 24 hours a day) of over eight months for his refusal to take an achievement test while at Attica Prison in 1969. Appellant's proffered reason for his refusal to take the test was his desire to protest the absence of a Black Studies program. There is no allegation that appellant was required to take the test because of discrimination against him. Since the test requirement was reasonable in light of the institution's program for rehabilitation, his refusal to participate did not immunize him from punishment. See *Rutherford v. Hutto,* 377 F.Supp. 268, 273 (E.D.Ark.1974).

■ In *Sostre v. McGinnis, supra,* 442 F.2d at 194, we said that we would not deny to prison authorities the right to determine the length of punitive confinement when the inmate fails to obey valid prison regulations. In *Wright v. McMann,* 460 F.2d 126, 134 (2 Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), we treated *Sostre,* however, as holding merely that the federal courts should be "chary in entertaining inmate petitions claiming unconstitutionally disproportionate punishment . . . ." While not every such claim requires a trial, under the facts of this case we are inclined against summary judgment. See also *LaReau v. MacDougall,* 473 F.2d 974, 978 n. 6 (2 Cir. 1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

## III

■ Appellant alleges that on March 16, 1965, at Attica Prison, he was charged with insolence and placed in the segregation unit for one year as a result (Second Amended Complaint ¶¶ 51–52). Appellant's brief acknowledges that he was also charged and found guilty of taking some brown wrapping paper without authorization, but alleges that he was unaware of a rule prohibiting this behavior. Although there are circumstances which might justify such an extreme punishment for such a minor offense, we are dealing with a grant of summary judgment. The appellant may prove at trial that the punishment was so discriminatory as to be constitutionally excessive. Of course, at trial, the prison authorities would be permitted to show that the seemingly harsh punishment was justified, in part because of appellant's cumulative record of disciplinary problems. There are issues of fact to be tried.

## IV

Appellant alleges that the ten months of punitive segregation imposed on him in February 1967 after an interview with Deputy Warden DeLong of Clinton Prison (not named as a defendant) was un-

---

for the condition of strip cells and other disciplinary units in his institution. In conjunction with evidence at trial of Warden McMann's actual knowledge of the conditions of the cell, this was held a sufficient predicate for § 1983 liability. Although in *Sostre v. McGinnis,* 442 F.2d 178, 189 (2 Cir. 1971) *(en banc), cert. denied,* 404 U.S. 1049, 92 S.Ct. 719,·30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), we refused to hold the Commissioner liable where there was no evidence that he knew of the warden's improper motives in punishing Sostre, in *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2 Cir. 1975), we held that a statutory requirement that the warden report to the Commissioner the status of all inmates in solitary confinement every five days met the personal responsibility requirements for suit under § 1983. It appears that the reporting requirement did not come into law until 1970, with the repeal of former §§ 137–140 of the Correction Law. We note, however, that § 114–a of the New York Correction Law, in effect since 1941, requires the warden to keep a daily record of infractions and punishments imposed, and requires that "such record . . . be kept open at all times to the examination of the commissioner of correction." We do not decide whether *Larkins* would apply to a period before 1970.

6. See *infra* for discussion of a possible extension of non-retroactivity to substantive as well as procedural matters in certain circumstances covered by this complaint.

constitutional (Second Amended Complaint ¶¶ 59–62). Mr. DeLong, in an affidavit dated May 17, 1967, swore that appellant, upon his transfer to Clinton Prison from Green Haven, was interviewed and

"flatly refused to cooperate with the Administration and observe the rules and regulations of the institution (copy of which had been furnished). Subsequent interviews have revealed no change in his attitude. Inasmuch as he has preached black power and the violent overthrow of the United States Government and intends to continue doing so, it is necessary to confine him in an area where a general prison disturbance can be avoided."

■ These statements have not been controverted by sworn testimony and there is no issue of fact. We think that Judge Bonsal properly granted summary judgment to the extent of the allegations of paragraphs 59 through 62. We have held it permissible to keep a prisoner in segregation until he agrees to abide by the rules of the institution. *Sostre v. McGinnis, supra,* 442 F.2d at 187, 192.

V

Moreover, in addition to the four incidents highlighted by appellant, we must also remand the case for trial in light of earlier decisions of this circuit, to determine whether plaintiff's confinement in "strip cells" at Clinton State Prison between 1963 and 1965, and at Auburn Prison in 1961 and 1962, amounted to cruel and unusual punishment under the Eighth and Fourteenth Amendments. See

*Wright v. McMann, supra,* 460 F.2d at 129–30; *LaReau v. MacDougall, supra,* 473 F.2d at 977–78.

■ *Cox v. Cook, supra,* decided that new court decisions on *procedural* matters affecting prisoners are not to be applied retroactively. See also *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In the context of tort liability under the Civil Rights Act, the Supreme Court said in *Pierson v. Ray, supra,* 386 U.S. at 557, 87 S.Ct. at 1219, "[w]e agree that a police officer is not charged with predicting the future course of constitutional law." While there are instances of gross abuse to human dignity so shocking to the conscience as to require no judicial pronouncement for their general recognition, see *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), there are other types of deprivation of rights which may be recognized as unconstitutional for § 1983 purposes only when they are judicially so declared. The quality of the wrong is both a question of fact and an ingredient of the measure of liability.

The conception of what is meant by "cruel and unusual punishment" in the language of the Eighth Amendment has been evolving in the past two decades. See Judge Friendly's discussion in *Johnson v. Glick, supra,* 481 F.2d at 1031–33.[7] No man can say today what the Eighth Amendment may mean tomorrow.[8] If the Eighth Amendment is governed by natural law, that law is itself chameleon in character. It reflects an evolving view of society as interpreted by the Supreme Court.[9] Nevertheless, when we

**7.** The content of the Eighth Amendment has been incorporated into the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Commentators have recently doubted "whether *Robinson* really presented an Eighth Amendment issue." Schwartz & Wishingrad, *The Eighth Amendment, Beccaria, and the Enlightenment: An Historical Justification for the Weems v. United States Excessive Punishment Doctrine,* 24 Buffalo L.Rev. 783, 802 (1975).

**8.** In *Wilkerson v. Utah,* 99 U.S. 130, 135–136, 25 L.Ed. 345 (1878), the Court said: "Difficulty would attend the effort to define with exact-

ness the extent of the constitutional provision which provides that cruel and unusual punishment shall not be inflicted."

**9.** In the words of Chief Justice Warren: "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). See also *Weems v. United States,* 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910); and Judge Kaufman's comments in *Sostre v. McGinnis, supra,* 442 F.2d at 191.

deal with situations involving "cruel and unusual punishment" one may argue that if the "violation" charged is not so shocking to the conscience as to be readily perceived, it is not an Eighth Amendment violation in any event. See *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2 Cir. 1970). And if it is so perceived, there is no need to declare it in advance of imposing liability. When we deal with violations of other constitutional rights of prisoners, however, there may be a sharper distinction between conduct that was allowable at the time and conduct that had already been declared beyond the limits of disciplinary prerogatives. The Supreme Court has now said that in a § 1983 case "[a] compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's *clearly established* constitutional rights that his action cannot reasonably be characterized as being in good faith" (emphasis added). *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

 It is the guardian of discipline who becomes the tort-feasor defendant when a civil rights suit is brought. The public officer may inflict harm which is a violation of a constitutional prohibition without conscious plan or illicit purpose. See *United States ex rel. Schuster v. Vincent,* 524 F.2d 153, 160 (2 Cir. 1975). But the test of liability ought not ignore entirely the *mores* of the times or even the particular *mores* of prison guards, untrained in the lawyers' view of life. The growth of constitutional protection in recent years in the area of First, Fourth and Fifth Amendment rights is illustrative of situations where retroactive application of newly declared doctrine may be unfair. See *Sostre v. McGinnis, supra,* 442 F.2d 178. It will be for the district court to determine, in the first instance, the standards to apply in light of the evidence.

We do not reverse the discretionary denial of leave further to amend *except*

with respect to the naming of additional defendants. See footnote 5, *supra.*

Affirmed in part; reversed in part, with directions to accept an amended complaint limited as required by this opinion.