Malik Abdullah AKILI, George Cardwell, and Mark Frasier, Plaintiffs,

v.

Benjamin WARD, Commissioner of the New York State Department of Correctional Services; Paul W. Metz and J. Leland Casscles, Supt. of Great Meadow Correctional Facility and former Supt. of Great Meadow Correctional Facility, respectively; Everett Jones, Deputy Superintendent for Security and William Fitzgerald, former Deputy Supt. for Security at Great Meadow Correctional Facility; one Currans and one Ripley, Lieutenants at Great Meadow Correctional Facility; one Welch, one Mulhall, one Fitzgerald, and one Henry, Sergeants at Great Meadow Correctional Facility; one Catalfamo, one Griffin, one Logan, and one Petticone, Correction Officers at Great Meadow Correctional Facility; and other Correction Officers known to plaintiffs, all Defendants being sued individually and in their official capacities, Defendants.

No. 76–CV–300.

United States District Court, N. D. New York.

Sept. 22, 1982.

Prisoners' Legal Services of New York, Albany, N. Y., for plaintiffs; Dennis A. Kaufman, Lanny E. Walter, David Leven, New York City, of counsel.

Robert Abrams, Atty. Gen., of the State of N. Y., New York State Dept. of Law, Albany, N. Y., for defendants; David B. Roberts, Alan S. Kaufman, Asst. Attys. Gen., Albany, N. Y., of counsel.

MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, Senior District Judge.

The complaint in this action was drafted for the three named plaintiffs, inmates of Great Meadow Correctional Facility, by the Albany branch of the Prisoners' Legal Services of New York. Judge Edmund Port by decision of July 19, 1976, granted leave to the plaintiffs to proceed in forma pauperis, directed filing of the complaint and its service upon the fifteen named defendants without payment of the required statutory fees. The complaint under 42 U.S.C. § 1983 set forth nine incidents of alleged assaults by various defendants claimed to be constitutional violations. Plaintiff, Mark Frasier, in the passage of years was released from confinement and by stipulation of the attorneys voluntarily dismissed his claims against all defendants. *See Frazier v. Ward*, 426 F.Supp. 1354 (N.D.N.Y.

1977). The claims of the two remaining plaintiffs, Akili and Cardwell, were dismissed against Commissioner Ward by stipulation of February 11, 1982.

Since the filing and service of the complaint, my contact with the case has been the denial and dismissal of seven separate motions filed by the Attorney General to dismiss the complaint in my single memorandum-decision and order of May 2, 1977. My next contact occurred by the filing of a motion by the plaintiffs on March 9, 1981, for trial by jury, and a motion by the Attorney General for separate trials. Both motions were denied, and finally, when the attorneys advised of their readiness for trial, the case was tried to the court for three days, February 22 to February 25, 1982. Testimony was taken and exhibits offered and received concerning five incidents of alleged use of excessive force. At the trial, upon motion, the complaint was dismissed against Superintendent Casscles and Deputy Superintendent Fitzgerald (Walter B., deceased) for failure of proof.

In *Wright v. McMann*, 321 F.Supp. 127, 134 (N.D.N.Y.1970), *aff'd in part, rev'd in part*, 460 F.2d 126 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 150 (1972), my observation was that the record of the trial was a portrayal of the real thing—prison life as it is. The record in this trial again portrays the actualities of daily prison life, the existing hostility and tension that many of us on the outside are totally unfamiliar with. Trials of this kind teach that many unforeseen and unexpected incidents are bound to happen in the confinement, servicing, movement and discipline of prisoners in the maximum security prisons such as Great Meadow with large inmate populations. Brutality and use of excessive force by correction officers, no matter the provocation, is unwarranted and, of course, should never be condoned. However, from experience, the court is mindful in evaluating the propriety of the use of force that the inmates are not to be considered seminarians, and the correction officers should not be expected to be supine and saintly when unexpectedly involved in volatile situations.

The testimony and exhibits received in evidence at the trial related to three separate incidents involving plaintiff Cardwell in which excessive force is alleged to have been used by certain correction officers. The dates of the Cardwell incidents are March 14, 1975, September 3, 1975, and September 4, 1975. Plaintiff Akili alleges the use of excessive force on September 3, 1975 and October 11, 1975. Plaintiff Cardwell, no longer in custody, and plaintiff Akili, still in confinement, testified at the trial about all the incidents, and two other inmates, who had to be transported to Albany from state prisons, testified concerning the Cardwell incident of March 14, 1975. Several of the correction officers mainly involved in the five incidents testified at the trial. As expected there is wide divergence in the testimony about the events that happened inside a prison in a tense and emotional atmosphere more than six years before. The task imposed upon the court is the same as that often imposed upon a jury to try to ascertain the truth from the conflicting versions. The evaluation of credibility is very important in the discharge of that responsibility.

Although the plaintiffs' attorneys view some as concoctions to cover up and conceal the truth, many of the details of these long ago incidents are supplied in the reports that were filed by the correction officers and their superiors on the day of the incidents or shortly thereafter. These reports are exhibits in evidence and among them are: (1) Misbehavior Reports, (2) Use of Physical Force Reports, (3) Facility Health Services Director Report to Superintendent concerning injuries, (4) Investigative Report to Superintendent, (5) Superintendent's Proceeding Report to Commissioner, (6) Superintendent Proceeding Record Sheet, (7) Formal Charges Superintendent Proceeding, (8) Adjustment Committee Report. This array of required reports indicates commendable administrative efforts by the Correction Department to lessen the possibility of unwarranted use of force upon inmates of the State prisons by requiring written explanations in official reports when physical force is used upon inmates.

### March 14, 1975 Incident—Plaintiff Cardwell

This incident began on that date when Cardwell appeared before an Adjustment Committee to answer charges that he had been late for gym and had verbally abused the gym teacher (Def. Ex. AA). Cardwell testified he was given seven days keeplock by the Committee and admits he questioned the decision. Correction Officer Hogan, in a misbehavior report, states Cardwell was ordered to leave the Committee Room three times but stood there threatening the Committee, using vulgar language. Correction Officers Catalfamo and Hogan, on duty in the Committee Room, had to grab Cardwell by the arms and shoulders to remove him from the Committee Room. (Def. Ex. AA, BB). The presiding Lieutenant at the hearing directed the officers to take Cardwell to Special Housing Unit D–1, instead of back to his cell in general population.

Upon the entry into D-Block, the relevant and critical events resulting in the use of force began to happen. The inmates in D-Block, when they saw Cardwell and the officers, started yelling and calling out to Cardwell. Cardwell testified he tried to answer them. Inmate Oliver who testified at the trial said that "everyone was screaming". Defendant Catalfamo testified that Cardwell began shouting the commonly used obscene language at the officers. In this setting of pandemonium, as I view it, there is dispute whether the cell door was open or closed when Cell 27 in which Cardwell was to be placed was reached. I find more credible, and in accord with security interests, the testimony of Correction Officer Hogan that the cell door was closed, and he turned to signal the console officer on the block to open the door for the entry of Cardwell.

The testimony of plaintiff Cardwell, to the contrary, is that the cell door was open, and as they reached the cell, he was pushed into the cell and hit with a baton by a correction officer from behind. Cardwell said he was propelled to the back of the cell, and that he believed that he sustained the injury over his left eye when he hit the wall. This one-inch cut caused from hitting the wall, as plaintiff states, required thirteen sutures to close, and left a scar—slight as I observed it at the trial.

As to the disputed versions of events that then occurred in a very short period of time, I find the testimony of Correction Officers Catalfamo and Hogan more acceptable and plausible. I find that when the cell door opened that Cardwell, stimulated by all the yelling of other inmates, did throw a punch at Catalfamo, and that Catalfamo ducked and tripped into the cell where he and Cardwell fell onto the floor and grappled on the floor and bed. There would be no reason for the officers to enter the cell if as Cardwell says he had been propelled into the wall of the cell and was inside the cell. Plaintiff Cardwell testified that he tussled inside the cell with Correction Officer Catalfamo and that he and Catalfamo wound up with each other on the bed in the cell. Cardwell refused to let Catalfamo go. (Def. Ex. AA—March 14, 1975 Report). I find that under these circumstances, it was natural for Correction Officer Hogan to go into the cell to aid his colleague and try to pry Cardwell's hands and legs from Catalfamo. I find that Hogan did hit Cardwell on his legs and hands with his baton, and possibly other parts of his body, to loosen Cardwell's grip. I find that Correction Officer Catalfamo fell into the cell and was grabbed around his body by Cardwell, and never used nor had the opportunity to use his baton to strike Cardwell during the altercation in the cell. (Def. Ex. D—Investigative Report Sgt. Brileya). The use of force reports support the version of the facts that I find acceptable. My finding is that the use of force was caused by Cardwell in hitting Correction Officer Catalfamo and then restraining and wrestling with him in the cell. Under the circumstances, the use of force was reasonable and necessary, and not excessive. The institutional record of Cardwell indicates he was a defiant and troublesome inmate throughout his confinement. (Def. Ex. S).

### September 3, 1975 Incident—Plaintiff Cardwell

This incident, and the remaining one involving Cardwell on September 4, 1975, and

the two involving Akili on September 3, 1975 and October 11, 1975, arose from their refusal to submit to the rectal examination of the strip search. It is conceded by the attorneys for the plaintiffs that this action does not challenge the legality of this portion of the search mandated at the time after contact with the public by 7 NYCRR 1020.5(b), but only challenges the manner in which the anal search was conducted, i.e., by alleged use of excessive force. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

On the afternoon of this date, Cardwell and Akili were seeing visitors in the visitors room with twenty-four (24) other inmates at Great Meadow. Both of them in the past had refused to submit to the visual rectal examination as required by the regulations. Akili left the visiting room first, and when brought to the strip frisk area, immediately outside the visitors room, again refused upon request to submit to the rectal examination. At that time, Akili, just outside the visitors room, shouted encouragement to Cardwell to maintain this same resistance to the rectal examination. Cardwell testified he was then pulled into the corridor to the strip search area by a correction officer and without any officer requesting him to submit to the rectal search, he was handcuffed in front of his body. Cardwell testified he was twisting and turning to avoid being handcuffed, but did not punch or kick any officers.

The defense testimony gives a completely different presentation of the situation. Lieutenant Lyons describes them in his report of September 3, 1975 (Def. Ex. I). The trial testimony of Lieutenant Lyons, Sergeant Mulhall and Correction Officer Nieves gave similar versions. Lieutenant Lyons says he was summoned from his office to the strip frisk area when notified that there was serious trouble there. Lyons went to the area with Sergeant Mulhall and other correction officers, and when they got there Correction Officer Tirado and Nieves were wrestling with Cardwell, who was punching and kicking the officers. Lieutenant Lyons tried to speak to Cardwell to calm him down, but Cardwell continued to

kick at the officers while cursing and screaming. Correction Officer Nieves testified that when Cardwell came into the frisk area, he was agitated and said he would not submit to the rectal examination. Nieves testified that when Correction Officer Tirado, who was conducting the frisk search, tried to persuade Cardwell to submit, Cardwell gave Tirado a karate chop to the throat and kicked him in the stomach. Cardwell threw Nieves against the wall of the stairwell when he went to assist Tirado. It was then that Lieutenant Lyons came on the scene with other officers pursuant to the emergency call and tried to calm Cardwell down. At that time, it was testified Cardwell then kicked Correction Officer Hall in the face, and Cardwell was put back on the floor and subdued, and then taken to F-Block in the prison. Further details of these incidents are set forth in the defendants' Proposed Findings of Fact filed with the Clerk, C. 20 to 26, and I accept and adopt such findings.

I find incredible the testimony of Cardwell that he was only twisting and turning to resist the frisk search, and was not punching or kicking the correction officers. The summoning of Lieutenant Lyons to the scene from his office in another part of the prison and the congregation of officers at the frisk area establishes that unusual incidents were occurring in this strip frisk area. I find that Cardwell was acting violently and assaulting the correction officers. If Cardwell had been as placid as he claims, in my judgment, the two correction officers assigned to the frisk area would have had no problem or need for assistance. I find that what occurred in an area where other inmates were gathered in the visitors room was due to the aggressiveness and violent resistance of Cardwell. I find the force used was necessary for the self-defense of the correction officers. Cardwell, at the direction of Lieutenant Lyons, was taken from the strip frisk area to F-Block by Sergeant Mulhall and two correction officers. Cardwell refused the rectal examination and was seized again and put down on the floor for the rectal examination. It is

at this time that Cardwell says an unidentified officer from the rear placed a rawhide thong around his neck and began to choke him to put him down. Sergeant Mulhall denies this and says Cardwell, who was handcuffed in front, was put down on the floor by arm holds in order to conduct the rectal examination. Attorney Lanny Walter described in his testimony the burn on the neck of Cardwell that he observed on September 4, 1975, as a quarter inch thick and grotesque in appearance. Cardwell refused to submit to medical examination on September 3, 1975, but a female nurse did put ointment on the neck injury, and later when an investigation was ordered, the burn injury was found to be real but could have come from several of the incidents when force had to be used on September 3, 1975. (Def. Exs. LL, N). There is no disposition on my part to approve the use of a thong of a baton to choke an inmate into submission. However, there is failure of proof in regard to such injury being inflicted as Cardwell claims. I find that the burn could have been sustained in several of the ongoing melees in which Cardwell was violently resisting the rectal examination, and was not inflicted maliciously to injure Cardwell after he was subdued. The other injuries sustained by Cardwell, bruises to his arms and legs, are consistent with the use of force that was necessary under the circumstances.

### September 4, 1975 Incident—Plaintiff Cardwell

On this date, the day after the serious altercations of September 3, 1975, Attorney Lanny Walter of Prisoners' Legal Services requested Superintendent Metz, at a prearranged meeting at the prison to exempt Cardwell from the rectal examination due to the injuries Cardwell sustained on September 3, 1975, or that it be conducted by the medical staff. The Superintendent refused, stating that he must enforce the regulation, and countered that Cardwell should not resist the required examination and should challenge the procedures in the courts. I find no fault with this position of the Superintendent. Cardwell was compelled to undergo the rectal examination, and I find only that necessary force was used, and not excessive force. The proposed findings of the defendant D–27 through 35 are adopted in regard to this incident.

### September 3, 1975 and October 11, 1975 Incidents—Plaintiff Akili

I have little difficulty resolving these incidents. Akili impressed me as a much more mature individual than Cardwell. He testified he never struck an officer, and resisted the rectal examination by trying to keep standing up, and wriggling when the correction officers tried to handcuff him. In each instance, I find the force used was arm and leg holds to compel the required examination, and in neither instance was excessive force used. The congregation of a great number of correction officers on October 11, 1975, when Cardwell and Akili were to be transferred out of Great Meadow was acceptable strategy. It partially worked because Cardwell submitted voluntarily and without resistance to the rectal examination. In regard to both incidents involving Akili, I adopt the findings of defendants B–14 through 19, and E–36 through 44.

### Conclusions of Law

The plaintiffs must prove by a preponderance of evidence that they were subjected to violation of constitutional rights. *Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir. 1977); *Rosenberg v. Martin,* 478 F.2d 520, 527 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). In view of the admitted resistance to the required rectal examination, there was undoubtedly a need for force, and the force used was commensurate with the need and was applied in a good faith effort to maintain discipline and restore order, and not maliciously or sadistically for the very purpose of injuring either plaintiff. *See Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Prison authorities may use reasonable force on prisoners

when administering prison regulations. *Argentine v. McGinnis,* 311 F.Supp. 134, 138 (S.D.N.Y.1969). Necessary force may be used by correction officers in self-defense against the actions of a violent prisoner. *Holt v. Hutto,* 363 F.Supp. 194, 215 (E.D. Ark.1973).

The force used was not excessive in any of the incidents. A violation of constitutional rights has not been proven, and judgment shall enter in favor of all remaining defendants dismissing the complaint.

It is so Ordered.