William L. BRACEY, Jr.

v.

John GRENOBLE, Appellant.

No. 73-1769.

United States Court of Appeals,
Third Circuit.

Argued Jan. 14, 1974.

Decided March 18, 1974.

Seitz, Chief Judge, filed a concurring and dissenting opinion.

David Mannis, Law Student, Howard Lesnick, Supervising Atty., Indigent Prisoner Litigation Program, Philadelphia, Pa., for appellee.

Michael Minkin, Asst. Atty. Gen., Chief, Civil Litigation, Eastern Regional Office, Lawrence Barth, Asst. Atty. Gen. Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Israel Packel, Atty. Gen., Philadelphia, Pa., for appellant.

Before SEITZ, Chief Judge, and KALODNER and ALDISERT, Circuit Judges.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are to decide whether there was sufficient evidence to sustain a non-jury

finding of liability in a Civil Rights Act proceeding brought by a prisoner against the senior officer of the guard at a Pennsylvania correctional institution. The court adjudicated in favor of the plaintiff and awarded damages in the amount of $2,500.00. The officer has appealed. We reverse.

## I.

We immediately dispose of defendant's improper venue contention. Clearly in a Civil Rights Act case brought under 42 U.S.C. § 1983, venue did not properly lie in the Eastern District of Pennsylvania. Under the provisions of 28 U.S.C. § 1391(b), this action "not founded solely on diversity of citizenship" could "be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law." Grenoble resides in the Middle District, and the claim arose in the Middle District. At the beginning of the trial, however, Michael Minkin, Assistant Attorney General, conceded to the court that the question of venue was waived.[1]

## II.

The trial record discloses that William L. Bracey, Jr., a prisoner at Camp Hill Institution, Pennsylvania, participated in an assault on a prison guard on November 18, 1968, for which he was convicted in a state court. His civil action encompassed events which occurred immediately after the events which led to his subsequent conviction. Two guards were assaulted on B-Block, one of whom was a Sergeant Bartlebaugh. The plaintiff candidly admitted that he "was participating in the assault right then."[2] Knives and daggers were used by pris-

---

[1]. Unfortunately, this is an example where one state assistant attorney general did not know what other assistant attorneys general had done in this case. Incredibly, the trial assistant attorney general did not have a copy of the pleadings with him at trial, stating, "My file doesn't reflect an answer being filed by our office." The contrary is true. An answer was filed on November 26, 1969, by William C. Sennett, Attorney General, by David W. Rutstein, attorney-at-law, and Frank P. Lawley, Jr., Deputy Attorney General. The following colloquy took place between the court and Mr. Minkin:

> THE COURT: There was an answer filed.
> MR. MINKIN: O.K.
> THE COURT: So, the question of venue is waived.
> MR. MINKIN: Waived.

At the close of plaintiff's case Mr. Minkin moved for a dismissal for lack of subject matter jurisdiction, or in the alternative, for dismissal for failure to state a claim upon which relief could be granted. Then again, at the conclusion of all testimony, Mr. Minkin moved for dismissal for failure to state a claim upon which relief could be granted. At neither time did he resurrect the venue question.

Judge Lord, at the conclusion of testimony, was "a little concerned" about the venue question. He observed that the defendant's Answer could be construed as raising an issue as to venue. In paragraph 1 of the Answer there appears the following statement: "[I]t is denied that the United States District Court for the Eastern District of Pennsylvania has jurisdiction over this action." Strictly speaking, the Eastern District had *jurisdiction*, but *venue* did not lie. It was at least arguable that the averment qualified as an intention to challenge venue. However, Mr. Minkin did not comment on this matter, despite the court's specific request for comment from both counsel.

2. Q. O.K. Now, after that assault on Bartlebaugh was completed, did it end?
A. Yes.
Q. What happened after it ended?
A. I was on my hands and knees, you know, like all fours, I was on the floor.
Q. Yes. How did you get there?
A. I wrestled Mr. Bartlebaugh to the floor.

\* \* \* \* \*

Q. You were on your hands and knees?
A. Yes, sir.
Q. How was Bartlebaugh; what was his position?
A. He was laying on the floor.
Q. On his back?
A. On his back.
Q. And you were on your hands and knees?
A. That is right.

\* \* \* \* \*

BY THE COURT:
Q. After Mr. Bartlebaugh was on the floor and you were on your hands and knees on the floor, what did you do then?
A. The door came open then.
. . . And Mr. Manchester and Mr.

oners in the assault.[3] The plaintiff testified that he left B-Block and "went out in the hallway and . . . was sprayed again with the can of Mace."[4] When asked if he knew who sprayed him, he replied: "I don't quite recall, but I remember Lieutenant Yucha then was out there in the hallway," and that "I did see Major—he was acting as major, Grenoble then in the hallway, when I went out in the hallway." He said that he was thrown to the floor but could not "recall which one pushed . . . [him] to the floor,"[5] and that while on the floor he was beaten with night sticks "for about five minutes. . . ."

Asked how much time elapsed between the time when he saw the defendant and the beating he received, he responded: "It was like, just like seconds. The time it took me to stand up and like the time it took them to Mace me, I would say about five or six seconds, that is all it took."

There is evidence that Grenoble was present at the time plaintiff was brought into the hallway; there is no evidence he was present during or throughout the beatings. The defendant was *seen* by plaintiff only at this one time, and his voice was *heard* later when plaintiff was brought up the hallway:

BY THE COURT:

Q. Mr. Bracey, from the time that you got through the door from B-Block into the corridor and the events that you have described took place, during that period of time do you know where the defendant Grenoble was?

A. When I entered the hallway he was standing behind the guards, he was standing right behind them, and like the guards with the Mace was along the wall and when I came out, I came out of B-Block like this way (indicating), and I turned this way (indicating), and like the guards came over and like two guards grabbed me and I was sprayed with the Mace then.

Q. And all during this period of time where was the defendant Grenoble; if you know?

A. When I came out like he was standing directly behind the guards, you know, like he was standing right in front of the door but directly behind the guards as I recall.

---

Truxton came in. . . . Mr. Manchester is a guard, security guard, and Mr. Truxton was the psychiatrist at Camp Hill. And Mr. Manchester sprayed me with the Mace, and I just laid there until it like started choking me, . . . .

3. Q. Mr. Bracey, I am asking you a question: Did you see anyone with a knife or dagger in his hand?
A. Yes, I did.
Q. They were attacking Sergeant Bartlebaugh at that time; is that correct?
A. Let me say: Mr. Bartlebaugh went around the desk and like they went around the desk.
Q. They were after him with knives and daggers?
A. That's the direction they went.
Q. Was Mr. Bartlebaugh bleeding when you tackled him?
A. Yes, he was.
Q. Do you know whether or not he was bleeding from the puncture wound of a knife or dagger?
A. No, I don't, no.

4. When asked what effect did the Mace have on him, he said: "It was like a blinding, you know, a glare, it gave me a real strong glare, and it was like choking me, my breathing. . . . It lasts about six or seven or eight minutes. . . ."

5. Q. Was it other prisoners or guards or who?
A. They had a circle around the door, around the complete door of B-Block when I went out.
Q. Who had a circle? Who is "they"?
A. The officers that was in the hallway when I entered. Like when I went out in the hallway it was Major Grenoble, acting Major Grenoble, and Lieutenant, and they were out in the hallway and they encountered me when I went out in the hallway or met me.
Q. Were there only two of them?
A. No. There were 20 or more officers out there.

THE COURT: All right.

BY MR. SOSKIN:

Q. Well, to clarify that, was that the only time you saw the defendant?

A. No. When I was being taken up the hallway I recall his voice, you know.

THE COURT: You recall his voice?

THE WITNESS: His voice.

THE COURT: Saying what? Do you know?

THE WITNESS: "Get him up there; go check on the keys."

The witness said that he was then taken through the hallway to the entrance of D-Block, about twenty-five feet further: "I was put on the wall, I was told to put my hands on the wall until they brought the key from the control desk, the control desk where they keep all the keys at. . . . I was told to like stretch out, put my hands on the wall. . . . I was facing the wall." He testified that some six guards brought him there. The group then waited for a key to arrive from the control clerk to open D-Block. He stated: "While waiting for the key, Lieutenant Yucha then was the one that was hitting me with the night sticks. As soon as they got the key he went across my face and then after—as soon as I was hit I was pushed in D-Block, I went in D-Block, and like they ripped my clothes off me and . . . Captain Wilkes started choking me. . . ." Significantly, plaintiff testified that he did not know where Major Grenoble was when he was struck by Lieutenant Yucha, when his clothes were ripped off, and when he was pushed down the steps.[6]

Plaintiff spent eight days in the Camp Hill Hospital. According to the nurses' and hospital records, his injuries consisted of a broken nose and a right eye injury.

### III.

The precise question that we address is whether Grenoble was responsible for the plaintiff's beating. We emphasize that we do not reach the question of whether the physical acts which led to the plaintiff's injuries were state torts only, or whether they amounted to constitutional deprivations. Smith v. Spina, 477 F.2d 1140 (3d Cir. 1973); Howell v. Cataldi, 464 F.2d 272 (3d Cir. 1972). Although at trial Grenoble's attorney took the position that the plaintiff failed to state the deprivation of a constitutional right, the district court specifically rejected that argument, and Grenoble has elected not to renew this contention before us.

That portion of the district court's opinion outlining the basis of defendant's responsibility is as follows:

We have no difficulty in concluding that the defendant Grenoble was in charge of the prison guards and had complete control over their actions. When a superior personally directs his subordinates to do acts or when he has actual knowledge of their acts and acquiesces in them, he is regarded as having been personally involved and is liable for his own conduct, not on the basis of *respondeat superior* but because of his direct personal involvement. Landman v. Royster, 354 F. Supp. 1302 (E.D.Va.1973); Wright v. McMann, 460 F.2d 126, 135 (C.A.2, 1972). We hold that Grenoble is liable for the injuries inflicted upon the plaintiff in violation of his constitutional rights.

In reaching the legal conclusion of Grenoble's liability, the district court relied on findings of fact "based largely on the testimony of the plaintiff which was

---

6. BY MR. MINKIN:

Q. Where was Mr. Grenoble when that guard hit you?

A. I don't know where he was at then.

Q. Where was Major Grenoble when your clothes were ripped off you?

A. I don't know where he was at then.

Q. Do you know where Major Grenoble was when you say they pushed you down the steps into the hall?

A. No, I don't.

straightforward and consistent . . ., [rejecting] out of hand the testimony of the Commonwealth's witnesses." We hold that the implicit findings of the trial court as to the adjudicative facts of "direction" or "actual knowledge and acquiescense" cannot survive under the clearly erroneous test. Krasnov v. Dinan, 465 F.2d 1298 (3d Cir. 1972).

Plaintiff frankly admits that he did not prove Grenoble's participation in the administration of the beatings. Incredibly, plaintiff did not sue the two officers of the guard whom he identified as beating him—Lieutenant Yucha and Captain Wilkes. There was no evidence introduced at trial that Grenoble gave orders "to do acts," i. e., to administer the beatings.[7] The court ruled out liability on the basis of *respondeat superior*, and the parties do not now contest this ruling. Therefore, if the district court's legal conclusion of liability is to be sustained it has to be, in the district court's words, on the theory: "[W]hen he has actual knowledge of their acts and acquiesces in them, he is regarded as having been personally involved and is liable for his own conduct. . . ."

We exclude the acts of violence in the hallway at the entrance to D-Block. Although Grenoble was placed at the other end of the hallway, and at some intermediate point in the hallway, plaintiff testified that he did not know where Grenoble was when he was "pushed in D-Block, like they was hitting me like for not—they weren't minutes, and they just ripped my clothes off."[8] If then there is to be liability, it must generate from Grenoble's earlier presence in the hallway or corridor between B-Block and D-Block.

■■ The mere fact of presence of a superior officer would not be sufficient to impose liability even under the district court's theory. Yet presence is evi-

---

7. An independent ground for reversal for a new trial is dictated by the district court's improper use of defendant's answers to interrogatories. Rule 33(a), F.R.Civ.P. provides: "Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them." Heilig v. Studebaker Corporation, 347 F.2d 686, 689 (10th Cir. 1965), emphasized that "answers to interrogatories do not become evidence in the case, unless voluntarily introduced. . . ." Patterson Oil Terminals, Inc. v. Charles Kurz & Co., 7 F.R.D. 250, 251 (E.D.Pa.1945), held: "The answers to interrogatories are not considered evidence until offered, as such, at trial. Coca-Cola Co. v. Dixi-Cola Laboratories, Inc., D.C., 30 F.Supp. 275." *See also* 8 Wright, Federal Practice and Procedure, § 2180 at 572.

Here, the critical interrogatory and answer, which were not introduced into evidence state:

5. Who was the highest person in command present during the incident?

At the scene was Captain John Grenoble and Lieutenant Yucha.

a). Were all actions carried out through his orders?

Yes.

The record discloses that the answers to plaintiff's interrogatories were signed by Grenoble's attorney, and they were not made under oath. The trial court stated: "Well, if you believe the plaintiff and if you believe the defendant's answers to interrogatories, there is plenty of evidence" to show participation by defendant in this case. The court was told that Grenoble did not see the interrogatories, and it was reported that Attorney Minkin had answered them. Mr. Minkin said: "[I]t hasn't been introduced as evidence." The court responded: "Oh! I take judicial notice of what is in the record." Therefore, the court ruled that it was taking as an admission of fact that Grenoble gave orders to have the plaintiff beaten. This ruling by the trial court is sufficient to reverse the judgment and order a new trial for three reasons: First, the answers to plaintiff's interrogatories were not made by Grenoble as required by Rule 33(a); Second, the answers were not made under oath; Third, the answer was not introduced into evidence, and it was error to take judicial notice of it. The answer to Interrogatory No. 5 was part and parcel of the disputed event; in no way can it be characterized as a matter of common knowledge or verifiable with certainty by consulting authoritative reference sources.

8. *See* footnote 6, *supra*.

dentiary on the facts of actual knowledge of and acquiescence in the unlawful acts of the subordinates. Even if we were to adopt the rule of law as stated by the trial court (in view of our decision in Curtis v. Everette, 489 F.2d 516 (3d Cir. 1973)), the burden is on the plaintiff to prove the facts of actual knowledge and acquiescence.

■ In an attempt to establish Grenoble's presence during the beating plaintiff testified that when he came out of B-Block he saw the defendant directly behind twenty guards. The beating, according to plaintiff, began five or six seconds after he saw the defendant. However, there was not one iota of direct evidence that Grenoble was present during the crucial time period—the five or six minute beating; nor was there evidence that Grenoble saw the plaintiff being beaten. Indeed, although there is evidence that plaintiff saw Grenoble at one time, there is no direct evidence that Grenoble ever saw plaintiff. Moreover, there is no proof that the defendant knew that the guards who participated in the beating had engaged in similar beatings in the past. The absence of this evidence is crucial to plaintiff's case, for in Curtis v. Everette, *supra*, we reversed the dismissal of a complaint which alleged, *inter alia*, that "defendants had actual knowledge of the dangerous nature and propensity of [plaintiff's attacker] Everette." In that same case we affirmed the court's dismissal of the complaint as to other defendants and stressed that "[t]here . . . [were] no allegations that . . . [the defendants] had reason to know . . . [that plaintiff's attacker] would commit such an assault or that similar assaults had taken place." (489 F.2d at 521) [9]

■ We would be more constrained to find actual knowledge and acquiescence if plaintiff had proved defendant's presence throughout the entire five or six minute beating. Likewise, if plaintiff had proved that Grenoble saw him being beaten, or if there were evidence of a history of such episodes by the participating guards, we would be hard put to hold that a trial court's finding of actual knowledge was clearly erroneous. Had this interlude been an isolated incident that day, we could invoke the laws of probability to conclude that the defendant remained in one spot to deal with the solitary troublemaker. But that is not this case. Putting plaintiff's incident in its proper perspective, his beating took place immediately after a major disturbance in B-Block in which knives and daggers were used to assault two prison guards. By his own admission, plaintiff's participation in the assault was minimal; he attacked the bleeding Sergeant Bartlebaugh with physical force only. Other prisoners used knives and daggers. Therefore, it is just as reasonable to conclude that Grenoble was looking after other facets of the prison disturbance, *i. e.*, apprehending the prisoners who used knives and daggers, as it is to conclude that he remained at the scene of plaintiff's beating.[10] Assuming without conceding the correctness of the district court's statement of the law, the brute fact remains that the district court's findings of actual knowledge and acquiescence are completely devoid of minimum evidentiary support and are, therefore, clearly erroneous. Krasnov v. Dinan, *supra*, 465 F.2d at 1302.

The judgment of the district court will be reversed and the proceedings re-

---

9. In Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir. 1973), Judge Friendly discussed at length the defendant warden's personal responsibility where he was not a participant in the constitutional deprivation. Holding that the warden could not be held liable for the acts of others, Judge Friendly emphasized, in part, that "there had been [no] . . . history of previous episodes requiring the warden to take . . . action" as was the case in Wright v. McMann, 460 F.2d 126 (2d Cir. 1972).

10. There is no evidence of a time lag between plaintiff's assault on Sergeant Bartlebaugh and the beatings received thereafter.

manded with a direction to enter judgment in favor of the defendant Grenoble.

SEITZ, Chief Judge (concurring and dissenting).

I believe that we should remand this case for reconsideration by the district judge, rather than entering judgment for the defendant.

I am willing to accept as applicable to Section 1983 actions the legal principle followed by the district court that "[w]hen a superior personally directs his subordinates to do acts, or when he has actual knowledge of their acts and acquiesces in them, he is regarded as having been personally involved and is liable for his own conduct, not on the basis of *respondeat superior* but because of his direct personal involvement."

It is not entirely clear, however, which of the two alternative tests contained in this statement the district court applied. The court's statement that it had "no difficulty in concluding that the defendant Grenoble was in charge of the prison guards and had complete control over their actions . . ." is ambiguous at best. It provides no indication whether the court found that the defendant actually ordered the beating or that the defendant had actual knowledge of the acts of his subordinates and merely acquiesced in them.

The court's emphasis on the answers to plaintiff's interrogatories seems to indicate that the court found that defendant actually ordered the guards to beat plaintiff.[1]. The district judge in his memorandum and order, however, points to nothing, other than the answers to the interrogatories, to support his conclusion that plaintiff was beaten by prison guards acting on specific directions from the defendant. Nor can I find in the record any other basis for such a conclusion.

Do the answers to interrogatories executed by defendant's counsel, and of which the district court took judicial notice, supply the missing ingredient? I am satisfied that they do not because, as Judge Aldisert says, they were not signed by the defendant, were not under oath, and, of critical importance, were not introduced into evidence. Nor do the answers constitute matter which is the proper subject of judicial notice.

Thus, the district court had no permissible basis for inferring that the defendant gave orders to beat plaintiff. Similarly, the answers to the interrogatories cannot be used as the basis for a finding that defendant had knowledge of and acquiesced in the beatings. It does not, however, inexorably follow that judgment should be entered for defendant.

Had the district court judge confined himself to the evidence, I cannot say whether he would have found knowledge and acquiescence on the part of the defendant to the beating after plaintiff had been effectively subdued. While I do not intimate that such a finding would be mandated by the record, I cannot say that the record could not support such a finding.

There was evidence placing the defendant at the scene both immediately before and immediately after the first incident in which the plaintiff was beaten. Possibly, because of its erroneous reliance on the answers to the interrogatories, the district court did not focus on this evidence. I would therefore remand and direct the district court to make properly based findings and draw conclusions concerning defendant's knowledge of and acquiescence in the beatings at the critical time.

---

1. The court stated that "in his answers to interrogatories [defendant] admitted that he was present at all times and that all actions of the guards were carried out at his orders."

The key interrogatory and answer is:

"5. Who was the highest person in command present during the incident?

At the scene was Captain John Grenoble and Lieutenant Yucha.

a). Were all actions carried out through his orders?

Yes."