Case reversed and remanded by Supreme
Court opinion fil ed 1/15/02

Cert. granted by Supreme Court on 3/26/01

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
<u>Plaintiff-Appellee,</u>

No. 98-1502

v.

WAFFLE HOUSE, INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-96-2739-3-10BC)

Argued: March 1, 1999

Decided: October 6, 1999

Before NIEMEYER and KING, Circuit Judges, and
LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Niemeyer wrote the opinion, in which Judge Lee joined.
Judge King wrote a dissenting opinion.

_____

COUNSEL

**ARGUED:** Stephen Floyd Fisher, JACKSON, LEWIS, SCHNITZ-
LER & KRUPMAN, Greenville, South Carolina, for Appellant. Rob-
ert John Gregory, EQUAL EMPLOYMENT OPPORTUNITY

COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Paul B. Lindemann, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Greenville, South Carolina, for Appellant. C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

This appeal presents the question of first impression in this circuit whether and to what extent the Equal Employment Opportunity Commission ("EEOC"), in prosecuting a suit in its own name, is bound by a private arbitration agreement between the charging party and his employer. Other circuits are split on the proper response to this question. Compare EEOC v. Kidder, Peabody & Co., 156 F.3d 298 (2d Cir. 1998) (holding that an arbitration agreement between a charging party and an employer precludes the EEOC from seeking purely monetary relief in federal court on behalf of the charging party but not from seeking broad injunctive relief), with EEOC v. Frank's Nursery & Crafts, Inc., 177 F.3d 448 (6th Cir. 1999) (holding that a private arbitration agreement does not affect the scope of the EEOC's federal court suit at all).

Recognizing that the EEOC is vested with enforcement authority both to seek broad-based injunctive relief in the public interest and to seek "make-whole" relief on behalf of a charging party, we conclude (1) that the EEOC cannot be compelled, by reason of an arbitration agreement between the charging party and his employer, to arbitrate its claims, but (2) that, to the extent that the EEOC seeks to obtain "make-whole" relief on behalf of a charging party who is subject to an arbitration agreement, it is precluded from seeking such relief in a judicial forum. Accordingly, we affirm the district court's decision to deny Waffle House's petition to compel arbitration generally and remand to the district court for consideration of the EEOC's claims in light of this opinion.

2

I

On June 23, 1994, Eric Baker, who was seeking employment, entered the Waffle House facility located at exit 113 of Interstate 26 in Columbia, South Carolina, and proceeded to fill out and sign an application for employment with Waffle House, Inc. He left blank the space on the application asking what position he sought. The application included a provision requiring the applicant to submit to binding arbitration "any dispute or claim concerning Applicant's employment with Waffle House, Inc., or any subsidiary or Franchisee of Waffle House, Inc., or the terms, conditions or benefits of such employment." Although the manager at that Waffle House facility, Lee Motlow, asked Baker whether he wanted the job there, Baker declined and instead, called the manager of a nearby Waffle House facility located at exit 110 of Interstate 26 in West Columbia, to whom Motlow had referred Baker.[1] The West Columbia Waffle House manager interviewed Baker and hired him to begin work two weeks later. Baker did not fill in another application and began work in the West Columbia facility on August 10, 1994, as a grill operator.

At his home, approximately two weeks later, Baker suffered a seizure, ostensibly caused by a change in the medication he was taking to control a seizure disorder that had developed as a result of a 1992 automobile accident. The next day, just after arriving for work, Baker suffered another seizure. Waffle House discharged Baker on September 5, 1994, stating in the separation notice that "We decided that for [Baker's] benefit and safety and Waffle House it would be best he not work any more."

Baker filed a charge with the EEOC, complaining that his discharge violated the Americans With Disabilities Act of 1990 ("ADA"), and on September 9, 1996, the EEOC filed this enforce-

_____

[1] In its answers to interrogatories, the EEOC stated more particularly: "Shortly after he had spoken with Motlow, Baker called the Manager at the Waffle House to which Motlow had referred him. The Manager interviewed Baker and hired him to work in another nearby Waffle House, Unit #446 in West Columbia. Baker visited Unit #446 and spoke with the Manager, Mike Bradley. They agreed that Baker would start two weeks later." J.A. at 13.

3

ment action in its own name against Waffle House pursuant to § 107(a) of the ADA, 42 U.S.C. § 12117(a), and § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, alleging that Waffle House had engaged in "unlawful employment practices at its West Columbia, South Carolina, facility." The EEOC stated in its complaint that its purpose for filing the suit was "to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Eric Scott Baker, who was adversely affected by such practices." It sought as relief (1) a permanent injunction barring Waffle House from engaging in employment practices that discriminate on the basis of disability; (2) an order that Waffle House institute and carry out antidiscrimination policies, practices, and programs to create opportunities and to eradicate the effects of past and present discrimination on the basis of disability; (3) backpay and reinstatement for Baker; (4) compensation for pecuniary and non-pecuniary losses suffered by Baker; and (5) punitive damages.

In response to the complaint, Waffle House filed a petition under the Federal Arbitration Act ("FAA"), 9 U.S.C.§ 1 et seq., to compel arbitration and to stay the litigation and, alternatively, to dismiss the action under Federal Rule of Civil Procedure 12(b)(6). The motion was referred to a magistrate judge who -- relying on the undisputed record consisting of the complaint, answers to interrogatories, and affidavits filed in connection with the motion to compel arbitration -- recommended to the district court that it conclude that Baker had entered into an arbitration agreement with Waffle House and that the EEOC was required to arbitrate the claims it filed on behalf of Baker. The district court, relying on the facts "extrapolated from the pleadings," disagreed with the magistrate judge's recommendations and denied each of Waffle House's motions, concluding that the arbitration provision contained in Baker's employment application was inapplicable because the West Columbia Waffle House facility, which ultimately hired Baker, had not hired him pursuant to his earlier application submitted at the Columbia Waffle House facility.

Waffle House filed this interlocutory appeal challenging the district court's denial of its petition to compel arbitration and to stay proceedings. See 9 U.S.C. § 16(a)(1). On appeal, it argues that (1) contrary to the district court's holding, a valid, enforceable arbitration agreement existed between Baker and Waffle House and (2) its motion to

4

compel arbitration under § 4 of the FAA should be granted because the arbitration agreement between Baker and Waffle House binds the EEOC to "assert Baker's claim in an arbitral forum."

II

Because arbitration is a matter of contract, we must first determine whether an enforceable arbitration agreement governed Baker's employment with Waffle House. See Johnson v. Circuit City Stores, Inc., 148 F.3d 373, 377 (4th Cir. 1998). The district court concluded that the arbitration agreement in Baker's employment application did not govern his employment relationship with Waffle House because it was submitted to the Waffle House facility at exit 113 of Interstate 26 in Columbia, and Baker was not ultimately employed at that facility. When Baker later went to the Waffle House facility at exit 110 of Interstate 26 in West Columbia, he was given a job there without submitting another application. The court thus concluded, "it does not appear that Baker's acceptance of employment at the West Columbia Waffle House was made pursuant to the written application which included the agreement to arbitrate."

We disagree with the district court's analysis because it assumes that the two Waffle House facilities were legally distinct entities in this context. The employment application Baker completed was the standard form application for employment with the corporation Waffle House, Inc., and not with an individual Waffle House facility. Indeed, the manager at the Columbia Waffle House facility referred Baker to the manager at the West Columbia Waffle House facility. In filling out the application, Baker left blank the space provided on the form for listing specific positions applied for, and he specified no intent to limit the application to a particular location. Moreover, when Baker did begin work at the West Columbia facility, he did not fill out another application. It cannot be assumed that a national corporation like Waffle House hired an individual without gathering any of the requisite information, such as his proper name, address, social security number, age and other personal data, qualifications, and references, all of which were contained in the application Baker originally submitted at the Waffle House facility in Columbia.

Accordingly, the fact that Baker was ultimately employed at a different facility than the one at which he was physically present when

5

he completed the application is immaterial to the applicability of the arbitration agreement. The generic, corporation-wide employment application completed and signed by Baker, and the arbitration provision it contained, followed Baker to whichever facility of Waffle House hired him. We thus conclude that Baker's application, when accepted by Waffle House, did form a binding arbitration agreement between Baker and Waffle House.

Having reached that conclusion, however, we must still determine what effect, if any, the binding arbitration agreement between Baker and Waffle House has on the EEOC, which filed this action in its own name both in the public interest and on behalf of Baker.

III

In its motion to compel arbitration, Waffle House sought "to enforce the arbitration agreement between Waffle House and Baker and compel the EEOC, on behalf of Baker, to submit Baker's employment related dispute with Waffle House to arbitration." On appeal, it continues to maintain that "[i]t is of no consequence under the FAA that the EEOC is bringing this action on behalf of Baker rather than Baker bringing this action directly" because the EEOC is "bound by Baker's arbitration agreement with Waffle House." The EEOC characterizes Waffle House's argument as "an astounding proposition." It argues that not only did it "never agree[] to arbitrate its statutory claim," but also that the EEOC "has independent statutory authority to bring suit in any federal district court where venue is proper." We agree with the EEOC.

In enforcing the federal antidiscrimination laws, the EEOC does not act merely as a proxy for the charging party but rather seeks to "advance the public interest in preventing and remedying employment discrimination." General Tel. Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318, 331 (1980). The EEOC's independent authority to enforce the ADA is clear.

In enacting the ADA, Congress chose to incorporate the enforcement "powers, remedies, and procedures" of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 12117(a) (incorporating by reference 42 U.S.C. §§ 2000e-4, -5, -6, -8, -9). These Title VII mechanisms vest

6

the EEOC with broad authority to enforce, in federal court, the statute's ban on disability-based discrimination. See 42 U.S.C. § 2000e-5(f)(1), (f)(3). Under Title VII as originally enacted, the EEOC's powers were limited to investigation and conciliation, and Congress relied exclusively on private parties' suits for enforcement. In 1972, however, seeking to remedy widespread noncompliance under this enforcement system, Congress amended Title VII, according the EEOC the right to file suit in federal court in its own name to eradicate discriminatory employment practices. See General Tel., 446 U.S. at 325-26. Although the amendments created a dual system of private and government enforcement, we have long recognized that "it was clear that Congress intended by these [1972] Amendments to place primary reliance upon the powers of enforcement to be conferred upon the Commission . . . and not upon private law suits, to achieve equal employment opportunity." EEOC v. General Elec. Co., 532 F.2d 359, 373 (4th Cir. 1976) (internal quotation marks and citation omitted).

Because of this public mission, the EEOC cannot be viewed as merely an institutional surrogate for individual victims of discrimination. See General Tel., 446 U.S. at 326 (holding that "the EEOC's enforcement suits should not be considered representative actions subject to Rule 23"). "[U]nlike the individual charging party, the EEOC [sues] `to vindicate the public interest' as expressed in the Congressional purpose of eliminating employment discrimination as a national evil rather than for the redress of the strictly private interests of the complaining party." General Elec., 532 F.2d at 373 (quoting EEOC v. Kimberly Clark Corp., 511 F.2d 1352, 1361 (6th Cir. 1975)); see also EEOC v. Harris Chernin, Inc., 10 F.3d 1286, 1291 (7th Cir. 1993) (concluding that because the EEOC's"interests are broader than those of the individuals injured by discrimination . . . private litigants cannot adequately represent the government's interest in enforcing the prohibitions of federal statutes" (citations omitted)); EEOC v. U.S. Steel Corp., 921 F.2d 489, 496 (3d Cir. 1990) (observing that "[p]rivate litigation in which the EEOC is not a party cannot preclude the EEOC from maintaining its own action because private litigants are not vested with the authority to represent the EEOC" (citations omitted)); EEOC v. United Parcel Serv., 860 F.2d 372 (10th Cir. 1988); EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539 (9th Cir. 1987).

7

The statutory structure of Title VII's enforcement remedies (and therefore those of the ADA) reflects the notion that the scope of the public interest exceeds that of the individual's interest. In order to preserve the EEOC's authority to litigate selectively those cases which it believes will have the most significant public impact, a charging party "may not proceed to federal district court until . . . the EEOC has made its own determination as to the validity of complainant's claim and issued a right-to-sue letter." Davis v. North Carolina Dep't of Correction, 48 F.3d 134, 138 (4th Cir. 1995). And if the EEOC chooses to file suit, the charging party may not bring his own suit; his right is then limited to intervening in the EEOC's suit. See 42 U.S.C. § 2000e-5(f)(1). In a similar vein, when a private individual brings suit, the court may, under certain circumstances, permit the EEOC to intervene to protect the national interest. See id. In addition, once the EEOC decides to sue in its own name, it is not limited to the facts presented in the charge. Rather, the EEOC may sue based on "[a]ny violations that [it] ascertains in the course of a reasonable investigation of the charging party's complaint." General Tel., 446 U.S. at 331; see also General Elec., 532 F.2d at 370. Finally, the EEOC's independent interest is also reflected in the fact that a charging party may not withdraw his charge without the consent of the EEOC. See 29 C.F.R. § 1601.10.

Even while empowering the EEOC to sue on a charge independently, Congress preserved the individual's private remedies under Title VII, indicating that private suits are still appropriate to redress individuals' grievances. And even when the EEOC has determined to bring suit in its own name, the charging party retains "the right to intervene in a civil action brought by the Commission" if the individual believes that the EEOC will not adequately represent his interests as it pursues its public objectives. See 42 U.S.C. § 2000e-5(f)(1); compare 29 U.S.C. § 626(c)(1) (terminating an individual's right to sue under the ADEA upon the EEOC's commencement of an action to enforce that individual's rights).**2** Congress anticipated that the

_____

**2** In concluding that this "distinctive enforcement scheme of the ADEA" illustrates the EEOC's "representative responsibilities when it initiates litigation to enforce an employee's rights," the Third Circuit expressly noted that the enforcement scheme of Title VII "from which the framers of the ADEA consciously departed . . . has no similar feature." U.S. Steel, 921 F.2d at 494 & n.4.

8

EEOC would not always be able to achieve the best possible result for each individual while at the same time pursuing its mission to vindicate the public interest. See General Tel., 446 U.S. at 331 (noting that the EEOC "is authorized to . . . obtain the most satisfactory overall relief even though competing interests are involved" and that it must make "the hard choices where conflicts of interest exist").

In short, under the 1972 amendments to Title VII, which are incorporated into the ADA, Congress has created a dual enforcement system, reflecting the notion that the EEOC and the charging party are not interchangeable plaintiffs. Each has its own distinct, albeit overlapping, interests for which overlapping remedies are provided. Thus, in pursuing the inquiry into whether the EEOC can be compelled to arbitrate on the basis of an arbitration agreement binding the charging party, we do not take the EEOC as a surrogate for the charging party, subrogated to his interest. Rather, we examine the related, but independent, interests of both the EEOC and the charging party to determine how an arbitration agreement signed by the charging party affects the prosecution of a claim by the EEOC.

First, we must recognize that neither the ADA nor Title VII as incorporated therein requires the EEOC to arbitrate. On the contrary, as demonstrated above, the 1972 amendments to Title VII clearly show that Congress intended that the EEOC vindicate the public interest by conciliation and then by suit in federal court. We must also recognize that in this case the EEOC is not a party to any arbitration agreement. See AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648-49 (1986); Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997) (explaining that "[e]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate" (citation omitted)). Thus, the only argument Waffle House could advance to require the EEOC to arbitrate is that the EEOC's interest in enforcing the ADA is derivative of Baker's interest. This argument, however, disregards the EEOC's independent statutory role as we have outlined it.

In addition, contrary to Waffle House's claims, neither of the other two circuits that have addressed the question of the impact of a private arbitration agreement on the EEOC's ability to sue in its own name have concluded that such an agreement permits a court to force

9

the EEOC into arbitration under the FAA. <u>See Frank's Nursery</u>, 177 F.3d at 462 (observing that "courts may not treat the agreement of a private party to arbitrate her action as the agreement of the EEOC to arbitrate its action"); <u>Kidder, Peabody</u>, 156 F.3d at 301-02 (upholding the district court's grant of the employer's motion to dismiss the EEOC's ADEA suit seeking solely monetary damages but not addressing the issue of compelling the EEOC to arbitrate because the employer did not seek to do so).

Moreover, the Supreme Court has recognized implicitly that the EEOC, acting in its public role, is not bound by private arbitration agreements. <u>See Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20 (1991) (holding that an employee's private arbitration agreement with her employer precluded <u>her</u> from filing suit against the employer under the ADEA). Although a private arbitration agreement does bar an individual ADEA claimant from asserting her claim in court, it does <u>not</u> prevent her from filing a charge with the EEOC. <u>See id.</u> at 28. This rule demonstrates the Court's recognition that the EEOC's suit can accomplish aims -- namely, combating discrimination on a societal level -- that an individual's suit is not equipped, nor perhaps intended, to accomplish. The court also emphasized, in refuting the argument that enforcing arbitration agreements would undercut the statutory scheme, that "it should be remembered that arbitration agreements will not preclude the <u>EEOC</u> from bringing actions seeking class-wide and equitable relief." <u>Id.</u> at 32. Thus, it is apparent that the Court did not intend that when an individual who is subject to an arbitration agreement files a charge, the EEOC can only pursue relief in an arbitral forum. To the contrary, the Court appears to have contemplated that arbitration agreements between charging parties and their employers would not infringe on the EEOC's statutory duty to enforce the antidiscrimination laws <u>in court</u>.

Accordingly, we conclude that Waffle House cannot succeed on its motion to compel the EEOC to arbitrate.

IV

While we have thus observed that the important role of the EEOC in vindicating the public interest in preventing and eradicating workplace discrimination is not to be restricted by arbitration agreements

10

to which it is not a party, its role in vindicating in federal court the individual interests of the charging party implicates the competing federal policy favoring the enforcement of arbitration agreements.

When an individual and an employer agree to submit employment disputes to arbitration, it is the federal policy to give that contract effect in order to favor the arbitration mechanism for dispute resolution. See 9 U.S.C. § 2; Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). To permit the EEOC to prosecute in court Baker's individual claim -- the resolution of which he had earlier committed by contract to the arbitral forum-- would significantly trample this strong policy favoring arbitration. Because Baker's own suit in court to enforce his ADA claim would be barred by his contract and by the federal policy embodied in the FAA, only a stronger, competing policy could justify allowing the EEOC to do for Baker what Baker could not have done himself. The EEOC's public mission to eradicate and to prevent discrimination may be such a policy in certain contexts, see Gilmer, 500 U.S. at 28, but, as we conclude herein, it cannot outweigh the policy favoring arbitration when the EEOC seeks relief specific to the charging party who assented to arbitrate his claims. Although the EEOC acts in the public interest, even when enforcing only the charging party's claim, cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-18 (1975), the public interest aspect of such a claim is less significant than an EEOC suit seeking large-scale injunctive relief to attack discrimination more generally.

Recognizing these competing policies, we agree with the balance struck by the Second Circuit, which held that although the EEOC "may seek injunctive relief in the federal forum for employees even when those employees have entered into binding arbitration agreements," it may not pursue relief in court -- in that case, monetary relief -- specific to individuals who have waived their right to a judicial forum by signing an arbitration agreement. Kidder, Peabody, 156 F.3d at 302-03; but see Frank's Nursery, 177 F.3d at 459-67 (holding that neither the FAA nor principles of preclusion or waiver could operate to bar the EEOC from seeking monetary relief on behalf of aggrieved individuals). When the EEOC seeks "make-whole" relief for a charging party, the federal policy favoring enforcement of private arbitration agreements outweighs the EEOC's right to proceed in federal court because in that circumstance, the EEOC's public interest

11

is minimal, as the EEOC seeks primarily to vindicate private, rather than public, interests. On the other hand, when the EEOC is pursuing large-scale injunctive relief, the balance tips in favor of EEOC enforcement efforts in federal court because the public interest dominates the EEOC's action.

Thus, we hold that to the extent that the EEOC seeks "a permanent injunction enjoining [Waffle House] from discharging individuals and engaging in any other employment practice which discriminates on the basis of disability" and an order to Waffle House "to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices," the EEOC is pursuing the public interest in a discrimination-free workplace, and it must be allowed to do so in federal court, as authorized by the ADA, notwithstanding the charging party's agreement to arbitrate. In seeking to "vindicate rights belonging to the United States as sovereign," EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1543 (9th Cir. 1987) (internal quotation marks and citation omitted), which are not necessarily identical to the interests of the individual charging party, the EEOC's course of conduct should not be affected by the actions of an individual in entering into a private arbitration agreement. See Part III, supra. In similar contexts where charging parties have been deprived of their right to sue either by settling their claims or having their claims dismissed, courts have nevertheless permitted the EEOC to maintain a suit for injunctive relief. See, e.g., EEOC v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1253 (11th Cir. 1997) (noting that "there would be little point in [the EEOC] having the independent power to sue if it could not obtain relief beyond that fashioned for the individual claimant"); EEOC v. Harris Chernin, Inc., 10 F.3d 1286, 1291-92 (7th Cir. 1993); Goodyear Aerospace, 813 F.2d at 1542-45.

Conversely, however, in these same contexts some of the same courts have recognized that a charging party's actions that impede his own right to sue can also circumscribe the contours of the EEOC's suit in its own name to the extent that it acts on behalf of the charging party. See, e.g., Goodyear Aerospace, 813 F.2d at 1543 (holding that the charging party's acceptance of a personal settlement of her claims rendered moot the EEOC's claims for backpay on her behalf); EEOC

12

<u>v. U.S. Steel Corp.</u>, 921 F.2d 489, 496 (3d Cir. 1990) (holding that the doctrine of <u>res judicata</u> barred the EEOC from seeking "individualized benefits" under the ADEA on behalf of individuals whose own suits were unsuccessful because the EEOC was "in privity" with those individuals); <u>Harris Chernin</u>, 10 F.3d at 1291 (following <u>U.S. Steel</u>'s reasoning with regard to the EEOC's claim for backpay, liquidated damages, and reinstatement for an individual whose suit was dismissed as barred by the statute of limitations).

Similarly, we also hold that when the EEOC enforces the individual rights of Baker by seeking backpay, reinstatement, and compensatory and punitive damages, it must recognize Baker's prior agreement to adjudicate those rights in the arbitral forum. Because the EEOC maintains that it "has no intention" of pursuing a claim in arbitration, we do not reach the question of whether the EEOC is <u>authorized</u> to do so. But it cannot pursue Baker's individual remedies in court, although it may seek broad injunctive relief in its public enforcement role.

Accordingly, we affirm the district court's order to the extent that it denied Waffle House's motions to compel the EEOC to arbitrate and to dismiss this action. We reverse its ruling that the EEOC may prosecute Baker's individual claims in court. And we remand with instructions to the district court to dismiss, without prejudice, the EEOC's claims asserted on behalf of Baker individually and to permit the EEOC to move forward on its claims for broad injunctive relief.**3**

<u>AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED</u>

KING, Circuit Judge, dissenting:

Because I agree with the district court that there was no agreement to arbitrate in this case, I must respectfully dissent. I would, therefore,

_____

**3** Waffle House argues that the EEOC is not entitled to broad injunctive relief because its claim relies exclusively on the incident involving Baker. We leave to the district court the question of whether the EEOC has pled sufficient facts to warrant the equitable relief it seeks. <u>See</u> 42 U.S.C. § 2000e-5(g)(1).

13

without reaching the issue of the authority of the EEOC to seek injunctive and "make-whole" relief for Mr. Baker on his ADA claim, simply affirm the decision of the district court.

I.

On June 23, 1994, Mr. Baker completed an employment application at a Waffle House restaurant in Columbia, South Carolina ("Columbia Waffle House" or "CWH"). **1** The district court found that the manager of the CWH offered Mr. Baker a job on that occasion, which Mr. Baker did not accept.

Approximately three weeks later, Mr. Baker travelled to a different Waffle House restaurant, one located in West Columbia, South Carolina ("West Columbia Waffle House" or "WCWH"), where, the district court found, Mr. Baker "orally applied for a job and was orally given a job which he accepted." J.A. 137. Mr. Baker did not execute a written employment application at the WCWH. Indeed, there is no evidence that the terms of the employment application that Mr. Baker completed at the CWH were discussed or adopted by Mr. Baker and

---

**1** The employment application completed by Mr. Baker contains a mandatory arbitration provision, which is comprised of four lines of single-spaced text located at the bottom of the first page of a two-page application. It states in full:

> The parties agree that any dispute or claim concerning Applicant's employment with Waffle House, Inc., or any subsidiary or Franchisee of Waffle House, Inc., or the terms, conditions or benefits of such employment, including whether such dispute or claim is arbitrable, will be settled by binding arbitration. The arbitration proceedings shall be conducted under the Commercial Arbitration Rules of the American Arbitration Association in effect at the time a demand for arbitration is made. A decision and award of the arbitrator made under the said rules shall be exclusive, final and binding on both parties, their heirs, executors, administrators, successors and assigns. The costs and expenses of the arbitration shall be borne evenly by the parties.

This provision, printed in seven-point font, occupies merely 5/16 of an inch of a page that is eleven inches long. No other clause in the employment application is printed in as small a font size.

14

Mike Bradley, the WCWH manager who hired Mr. Baker. Since there was no evidence on the point, the district court found that it did not appear that the "management [of WCWH] knew of or had the benefit of the application form which Baker had previously signed." J.A. 137-38.

The district court made no findings connecting the WCWH offer to the CWH offer that Baker had rejected.**2** Further, the district court's affirmative rejection of the magistrate judge's findings, see supra note 2, is, in itself, a factual finding that requires our deference. The district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside [on appeal] unless clearly erroneous." Fed. R. Civ. P. 52(a). Findings of fact may be overturned only if we are "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564,

_____

**2** In its written opinion of March 20, 1998, from which this appeal is taken, the district court found and concluded as follows:

> [T]his Court sua sponte inquired concerning the existence of evidence that Baker and Waffle House made an agreement to arbitrate with respect to the job he accepted. The facts stated by the Magistrate Judge which are extrapolated from the pleadings do not suggest that an employment agreement came into being following Baker's signing of the application form on June 23, 1994. Baker left the Columbia Waffle House without accepting employment. It does not appear from the statement of facts relied upon by the Magistrate Judge that when Baker went to the West Columbia, South Carolina Waffle House, the management there knew of or had the benefit of the application form which Baker had previously signed. Instead, it appears that Baker orally applied for and was orally given a job which he accepted. That being the case, it does not appear that Baker's acceptance of employment at the West Columbia Waffle House was made pursuant to the written application which included the agreement to arbitrate. For that reason, I am unable to agree with that portion of the Magistrate Judge's conclusions.

J.A. 137-38. Significantly, the district court expressly rejected the magistrate judge's conclusion that Baker "appear[ed] to have assented to be bound by the prior agreement, that if employed he would submit his claim to arbitration," by Baker's subsequent acceptance of employment at the WCWH.

15

573-74 (1985).**3** The majority wrongly implies that an appellate court may consider and adopt facts found by a magistrate judge -- facts already expressly rejected by the district court-- without finding such facts to be clearly erroneous.**4**

Based on its factual findings, the district court concluded that Mr. Baker and Waffle House had not made an agreement to arbitrate with respect to the job that he ultimately accepted -- the position of grill operator at the West Columbia Waffle House. Consequently, the district court denied Waffle House's motion to compel arbitration and its motion to dismiss.

The district court's findings of fact are not clearly erroneous, and its conclusion that there was no agreement to arbitrate follows perforce from its findings. Accordingly, I would affirm the district court's order denying Waffle House's motions to dismiss and compel arbitration, thereby enabling the EEOC to pursue injunctive and "make-whole" relief on behalf of Mr. Baker.

_____

**3** <u>See also</u> Fed. R. Civ. P. 52 advisory committee's note (1985) (public interest recognizes the trial court, not the appellate tribunal, as the fact-finder, to promote stability and judicial economy). When a court of appeals actively engages in the fact-finding function, it undermines the legitimacy of the district courts. <u>Id.</u>

**4** While the majority asserts that the EEOC interrogatory answers support its factual scenario, <u>see ante</u> p.3 note 1, these answers are legally irrelevant for at least three reasons: (1) they are invalid because they were not made under oath (as required by Rule 33(b) of the Federal Rules of Civil Procedure); (2) they are signed by counsel only (not by Baker, who had the requisite personal knowledge); and (3) their evidentiary value was repudiated by the EEOC at oral argument. <u>Bracey v. Grenoble</u>, 494 F.2d 566, 570 n.7 (3rd Cir. 1974). Accordingly, these answers could not and cannot be properly relied on in this case. <u>See id.</u> Most importantly, subsequently filed affidavits (properly sworn) do not contain the information relied upon by the majority, <u>see</u> J.A. 12, 28, and that information is contrary to the findings of the district court. <u>See supra</u> note 2. As I have noted, the majority has not determined the factual findings of the district court to be clearly erroneous.

16

II.

A.

The Federal Arbitration Act ("FAA"), 9 U.S.C.§ 1, et seq., which governs here, represents "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Where there is a valid agreement to arbitrate that covers the matter in dispute, the FAA requires federal courts to stay any ongoing judicial proceedings and compel arbitration. See Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 937 (4th Cir. 1999) (citing the FAA, 9 U.S.C. §§ 3, 4).

But the mandate and policy concerns of the FAA come into play only if the claims at issue are arbitrable in the first instance, and if there is a valid agreement to arbitrate. See Phillips, 173 F.3d at 937-38. This court has held that a claim such as Baker's is arbitrable; the ADA does not prohibit arbitration of a claim arising under that statute. See Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 881 (4th Cir. 1996) ("The language of the[ADA] could not be any more clear in showing Congressional favor towards arbitration."); see also Phillips, 173 F.3d at 937. However, the question remains whether Mr. Baker and Waffle House entered into an agreement to arbitrate that would require Mr. Baker to arbitrate any ADA claim arising from his employment at the WCWH.

Whether a contract to arbitrate exists is "an issue for judicial determination to be decided as a matter of contract." Johnson v. Circuit City Stores, 148 F.3d 373, 377 (4th Cir. 1998) (citing AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648-49 (1986)). In deciding this issue, we should apply "ordinary state-law principles that govern the formation of contracts." Johnson, 148 F.3d at 377 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

South Carolina law supports the district court's conclusion here. In recognition of the fact that Mr. Baker did not accept the offer of employment at the CWH, the district court held that "no employment agreement came into being following Baker's signing of the application form on June 23, 1994." The formation of contracts under South

17

Carolina law "is governed by well-settled principles." <u>Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.</u>, 437 S.E.2d 122, 125 (S.C. Ct. App. 1993).

> Quite simply, [a] contract exists where there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act. Stated another way, there must be an offer and an acceptance accompanied by valuable consideration.

<u>Id</u>. (internal citations and quotation marks omitted).

When the manager at the Columbia Waffle House offered Mr. Baker a job, the terms of <u>that</u> offer included the provisions of the employment application, which Mr. Baker had completed in the restaurant on June 23, 1994, while the restaurant manager was sitting next to him. Those terms were part of the "bargained-for exchange" offered by the manager of the CWH.**5** "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981); <u>see also</u> <u>Prescott v. Farmers Tel. Coop.</u>, 516 S.E.2d 923, 926 (S.C. 1999). "The offer identifies the bargained for exchange and creates a power of acceptance in the offeree." <u>Carolina Amusement</u>, 437 S.E.2d at 125 (citations omitted). Without an acceptance of an offer, there can be no contract. <u>Id.</u>; <u>see also</u> Restatement (Second) of Contracts § 35 cmt. c.

Because Mr. Baker declined to accept the job offered on June 23, 1994, by the manager of the CWH, no employment agreement was

_____

**5** Indeed, at the top of the application in large, bold, capital letters, Waffle House states the following requirement:

MUST BE COMPLETED IN THE RESTAURANT

J.A. 26. The choice of the definite article "the" is telling. Which restaurant must the application form be completed in? The answer is obvious -- <u>the</u> Waffle House restaurant to which the job applicant is applying.

In Mr. Baker's case, he did just what the form required -- he completed the employment application in the Columbia Waffle House -- the restaurant to which he was applying when he filled out the application.

18

formed. <u>Id</u>. Under settled legal principles, the terms of the rejected offer, including the provisions of the employment application, did not survive the rejection of the offer. Mr. Baker's power of acceptance of <u>that</u> offer was terminated by his rejection of it. <u>See</u> Restatement (Second) of Contracts §§ 36, 38 (when offeree rejects offer, his power of acceptance is terminated).

When Mr. Baker, three weeks later, travelled to the West Columbia Waffle House and orally applied for a job there, its manager, Mr. Bradley, made Mr. Baker an offer for a job as a grill operator at $5.50 an hour. Mr. Baker accepted Mr. Bradley's offer on the spot. There is no evidence that the provisions of the June 23, 1994 employment application were adopted, or even discussed, as part of the employment agreement that came into being three weeks later at the West Columbia Waffle House. <u>See Player v. Chandler</u>, 382 S.E.2d 891, 893 (S.C. 1989) (a valid and enforceable contract requires "a meeting of the minds between the parties with regard to the essential and material terms of the agreement"). Thus, there is no basis for the majority's conclusion that Mr. Baker agreed to arbitrate claims arising from his employment at the West Columbia Waffle House.**6**

B.

In its opinion, the majority simply relies on its own assumptions about corporate practices, as if those are somehow dispositive of the question whether an agreement to arbitrate has been formed, while ignoring the district court's factual findings. **7** The majority's holding -- that the "generic, corporation-wide employment application completed and signed by Baker, and the arbitration provision it contained, followed Baker to whichever facility of Waffle House hired him," <u>ante</u> at 6 -- creates an unprecedented rule that has disturbing implications beyond the injustice done to Mr. Baker.

_____

**6** It is undisputed that when Mr. Baker spoke with Mr. Bradley about a job at the WCWH, Mr. Bradley mentioned neither arbitration nor anything else about the way disputes were settled between Waffle House and its employees.

**7** Indeed, the majority substitutes its assumptions for the district court's findings, and fails to review or analyze the district court's findings for clear error. <u>See</u> Section I.

19

Under the rule the majority creates today, the terms contained in an employment application submitted to one facility in a restaurant chain, or any other business chain, become binding on the job applicant if she is subsequently hired by another facility in the same chain. In effect, the terms contained in the employment application, including the mandatory arbitration provision, become free-floating, ready to bind the unsuspecting job applicant whenever and wherever she might obtain employment with the same chain. It is not surprising that the majority fails to cite any authority to support its conclusion. As explained above, the majority's holding is untenable under fundamental principles of contract law.[8]

---

[8] In addition, I believe that even under the majority's theory -- that the employment application "followed" Mr. Baker to the West Columbia Waffle House -- the arbitration provision would be unenforceable.

First, the arbitration provision mandates that the employee pay one-half of the costs and expenses of arbitration, see supra note 1 ("The costs and expenses of the arbitration shall be borne evenly by the parties"). At least three of our sister circuits have held that a mandatory arbitration agreement that requires an employee to pay a portion of the arbitrator's fees is unenforceable under the Federal Arbitration Act. See Shankle v. B-G Maintenance Mgmt. of Colorado, Inc., 163 F.3d 1230 (10th Cir. 1999); Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054 (11th Cir. 1998); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997). These courts reasoned that if an employer requires an employee to agree to mandatory arbitration as a condition to obtaining or continuing employment, thereby prohibiting the employee from using the judicial forum to vindicate his rights, then the employer must provide an accessible alternative forum. See, e.g., Shankle, 163 F.3d at 1235. If an arbitration agreement requires the employee to pay a portion of the arbitrators' fees -- which often may amount to thousands of dollars -- an accessible forum is, in effect, unavailable, because of the disincentive to arbitrate created by such fees. Id. Under these circumstances, an employee like Mr. Baker is unlikely to pursue his statutory claims. See Cole, 105 F.3d at 1484 (noting that arbitration fees "are unlike anything that [employee] would have to pay to pursue his statutory claims in court"). As the Tenth Circuit reasoned, "[s]uch a result clearly undermines the remedial and deterrent functions of the federal anti-discrimination laws." Shankle, 163 F.3d at 1235 (citations omitted).

Second, the mandatory arbitration provision would be unenforceable because it is so inconspicuous that it failed, as a matter of law, to provide

20

The majority's rule has no temporal or geographical limits. For example, suppose a student submits an employment application to a McDonald's in North Carolina, and is offered but declines a position there. Then, months or years later, she seeks and obtains employment at a McDonald's in Maryland without submitting another written employment application. Under the majority's rule, she would be bound by the terms of the employment application submitted earlier in North Carolina.

Moreover, if a job applicant wishes to escape the stranglehold of the "generic, corporation-wide employment application," he must specify <u>his</u> "intent to limit the application to a particular location." <u>Ante</u> at 5. The Waffle House application, however, does not request the applicant to specify which Waffle House locations he is applying for. And the application form itself clearly assumes that the job seeker is applying for a position at <u>the</u> restaurant where he obtained and completed the application. Yet the majority would nonetheless require the job applicant -- rather than the corporation that drafted the terms of the employment application -- to specify his intent, which is not asked for, to limit the application to a particular location. To place such a duty on job applicants is patently unfair and unwarranted.

Common sense tells us that a person who physically goes to the Wal-Mart in Lewisburg, West Virginia, is applying for a job at <u>that</u> Wal-Mart, not one in Richmond, Virginia, or Charlotte, North Carolina, absent express negotiations to the contrary. He would not reasonably expect that the employment application submitted to the

_____

Mr. Baker with sufficient notice that he was waiving his right to a judicial forum for his statutory claims. <u>See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 170 F.3d 1, 20-21 (1st Cir. 1999). In <u>Rosenberg</u>, the First Circuit interpreted the Supreme Court's decision in <u>Wright v. Universal Maritime Serv. Corp.</u>, 525 U.S. 70 (1998), and a provision of the 1991 Civil Rights Act (which is also included in the ADA), as requiring that "there be some minimum level of notice to the employee [who is a party to a private arbitration agreement] that statutory claims are subject to arbitration"). <u>Rosenberg</u>, 170 F.3d at 20-21. With its buried arbitration provision, Waffle House failed, as a matter of law, to provide such "minimum level of notice" to Mr. Baker that he was required to arbitrate his ADA claim. <u>See Rosenberg</u>, 170 F.3d at 20.

Lewisburg Wal-Mart would be considered an application to work in Richmond or Charlotte. The majority sets a trap for the unwary job applicant by the counterintuitive rule that it has created today.

III.

Because I agree with the district court that there was no agreement to arbitrate between Waffle House and Mr. Baker, I would affirm its ruling and permit the EEOC to pursue both injunctive and "make-whole" relief on behalf of Mr. Baker.

I respectfully dissent.

22